548

Leonard Barrack (LB-0355)
Gerald J. Rodos (GR-0374)
Jeffrey W. Golan (JG-8892)
Leslie B. Molder (LM-6040)
**BARRACK, RODOS & BACINE**
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
(215) 963-0600

Max W. Berger (MB-5010)
Daniel L. Berger (DB-7748)
Jeffrey N. Leibell (JL-1356)
**BERNSTEIN LITOWITZ BERGER &**
 **GROSSMANN LLP**
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

**Lead Counsel for Purchasers and Acquirers of All Cendant Corporation and
CUC International, Inc. Publicly Traded Securities Except PRIDES**

MAY 5 _ 2000

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

------------------------------------------------x
               :

In re:            :

            :

CENDANT CORPORATION    :
LITIGATION            :

            :

           :

------------------------------------------------x

Master File No. 98-1664 (WHW)

This document relates to:
All Actions Except the Prides Action (No. 98-2819)

**Return Date: June 28, 2000 at 10:00 a.m.**

**JOINT DECLARATION OF
MAX W. BERGER AND LEONARD BARRACK
IN SUPPORT OF MOTION FOR APPROVAL OF
PROPOSED SETTLEMENT OF CLASS ACTION AND
PLAN OF ALLOCATION OF NET SETTLEMENT FUND, AND
IN SUPPORT OF PETITION FOR AN AWARD OF
ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

We, MAX W. BERGER and LEONARD BARRACK, declare as follows:

1.     We are members, respectively, of the law firms of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") and Barrack, Rodos & Bacine ("BR&B"). BLB&G and BR&B are counsel to lead plaintiffs the New York State Common Retirement Fund (the "NYSCRF"), the California Public Employees' Retirement System ("CalPERS") and the New York City Pension Funds (the "NYCPF") ("Lead Plaintiffs"), and are court-appointed Lead Counsel to the certified class in this action.

2.     This Joint Declaration is submitted in support of the motion to approve the proposed settlement of this action and the Plan of Allocation of Net Settlement Fund (the "Plan of Allocation"), and the petition for an award of attorneys' fees and reimbursement of expenses.

## THE SETTLEMENTS

### SUMMARY

3.     On behalf of the Class, Lead Plaintiffs have entered into two separate proposed settlements that together will resolve all of the Class's claims against all defendants in the action filed by Lead Plaintiffs on behalf of the Class under Master File No. 98-1664 (WHW) (the "Action").

4.     One proposed settlement is with Cendant Corporation ("Cendant" or the "Company") and the following individuals who were named as defendants in the Action:  Henry R. Silverman, President, Chief Executive Officer and a director of Cendant; John D. Snodgrass, Vice Chairman and a director of Cendant; Michael P. Monaco, Vice Chairman, Chief Financial Officer and a director of Cendant; James E. Buckman, Senior Executive Vice President, General Counsel and a

2

director of Cendant; Scott E. Forbes, Senior Vice President – Finance of Cendant; and the following former directors of HFS and, subsequently, of Cendant:  Steven P. Holmes; Robert D. Kunisch; Leonard S. Coleman; Christel DeHaan; Martin L. Edelman; Brian Mulroney; Robert E. Nederlander; Robert W. Pittman; E. John Rosenwald, Jr.; Leonard Schutzman; and Robert F. Smith (collectively, the "HFS Individual Defendants").  As a condition of the Cendant Settlement, Lead Plaintiffs and the Class also will dismiss all claims against the following former officers of CUC, and, subsequently, of Cendant:  Walter Forbes, Chairman of Cendant's Board of Directors and a member of Cendant's Executive Committee; E. Kirk Shelton, Vice Chairman and director of Cendant; Christopher K. McLeod, Vice Chairman and Director of Cendant; Cosmo Corigliano, Senior Vice President and Chief Financial Officer of CUC and later Chief Financial Officer of CMS; and Anne M. Pember, Senior Vice President and Controller of CUC and CMS; and the following former directors of CUC:  Burton C. Perfit; T. Barnes Donnelley; Stephen A. Greyser; Kenneth A. Williams; Bartlett Burlap; Robert P. Ritterciser; and Stanley M. Rumbough, Jr. (collectively, the "CUC Individual Defendants").

5.      The other proposed settlement is with defendant Ernst & Young LLP ("E&Y").

6.      The settlement with Cendant and the HFS Individual Defendants (the "Cendant Settlement") includes a payment for the Class of $2,851,500,000 in cash, a 50% interest in any net recovery Cendant or the HFS Individual Defendants may obtain from E&Y in resolution of claims they have or are litigating against E&Y, and Cendant's implementation of significant corporate governance improvements (as described more fully below in paragraphs 8-14); the settlement with E&Y (the "E&Y Settlement") includes a payment for the Class of $335,000,000 in cash.  Together,

3

the Settlements will create a settlement fund that totals $3,186,500,000 in cash, plus interest, by far, the largest settlement of a securities class action in history.

7.     If approved, the Settlements will resolve completely and with prejudice all of the Class's claims in the Action.

## THE CENDANT SETTLEMENT

8.     The Cendant Settlement has three primary elements:

a.     Cendant will pay $2,851,500,000 in cash for the benefit of the Class (the "Cendant Settlement Amount");

b.     Cendant and the HFS Individual Defendants also will pay for the benefit of the Class 50% of any net recovery that they obtain from E&Y in resolution of claims they have or are litigating against E&Y; and

c.     Cendant will institute significant corporate governance improvements.

9.     Cendant's obligation to pay the cash will be guaranteed. Within 90 days following the Court's approval of the Cendant Settlement, Cendant, at its expense, must obtain from financial institutions acceptable to Lead Plaintiffs either an irrevocable Letter of Credit, a Surety Bond (of creditworthiness equivalent to a Letter of Credit) or a combination thereof (the "Security") in the full amount of the Cendant Settlement Amount. The Security shall be maintained by Cendant in favor of Lead Plaintiffs and the Class until such time as Cendant makes payments as specified in the Stipulation of Settlement.

4

10.     The Cendant Settlement Amount will earn interest for the benefit of the Class. Beginning on the later of August 20, 2000 or five days after this Court approves the Cendant Settlement, interest will accrue at a rate equal to the rate earned by 30-day U.S. Treasury Bills.

11.     The entire Cendant Settlement Amount (after deduction of Court-approved costs, expenses and attorneys' fees), plus interest, will be distributed to Class Members who timely submit valid Proofs of Claim.  There will not be any reversion to Cendant of any portion of the Cendant Settlement Amount.

12.     The Class also will receive one-half of any net recovery that Cendant or the HFS Individual Defendants obtain from E&Y in resolution (by settlement, trial or otherwise) of claims they have or are litigating against E&Y.  This amount, plus interest, will be distributed to Class Members who timely submit valid Proofs of Claim.  There will not be any reversion to Cendant or to the HFS Individual Defendants of any portion of this amount.  Litigation between Cendant and E&Y is currently pending; neither Lead Counsel, Lead Plaintiffs, nor Class Members have any control or decision making authority over that litigation.

13.     Also as part of the Cendant Settlement, Cendant has agreed to institute certain significant corporate governance improvements, which Lead Plaintiffs believe are far-reaching and unprecedented in securities class action litigation.  These improvements include:

a.      Within 30 days following the effective date of the Cendant Settlement, the Audit Committee, Nominating Committee and Compensation Committee of Cendant's Board of Directors (the "Board") each will be comprised entirely of independent directors according to the following specific definition, endorsed by the institutional investment community:

A director shall be considered "independent" if he or she has no relationship to Cendant that may interfere with the exercise of his or her independence from Cendant and its management.  Individuals with the following relation-

5

ships to Cendant are not independent: employment by Cendant or any of its affiliates during the then-current year or any of the past five years; acceptance of compensation from Cendant or any of its affiliates other than compensation for Board service or benefits under a tax-qualified retirement plan; an immediate family member of an individual who is, or has been in any of the past five years, employed by Cendant or any of its affiliates as an executive officer; partnership interest in, controlling shareholder interest in, or executive officer of any for-profit business organization to which Cendant made, or from which Cendant received, payments that are or have been significant to Cendant or the business organization in any of the past five years; and employment as an executive of another company where any of Cendant's executives serve on that company's compensation committee;

      b.     The majority of the Board will be independent within two years following final approval of the Cendant Settlement;

      c.     Cendant will present to its shareholders for approval at the next annual meeting of shareholders following the Effective Date of the Cendant Settlement a proposal to amend Cendant's Certificate of Incorporation de-classifying the Board and provide that all directors shall be elected annually; and

      d.     Within 30 days of the effective date of the Cendant Settlement, the Board will adopt a By-Law precluding repricing of any employee stock option after its grant, unless approved by a majority vote of voting shareholders (except in accordance with its terms to take into account corporate transactions such as stock dividends, stock splits, recapitalizations, merger or distributions).

      14.     Under the Cendant Settlement, Class Members will release all claims that were filed

or could have been filed in the Action against Cendant, the HFS Individual, the CUC Individual, and

Cendant's parent entities, affiliates, subsidiaries, predecessors (including CUC, International, Inc,

("CUC")), successors or assigns, and each of its past, present or future officers, directors, associates,

stockholders, controlling persons, representatives, employees, attorneys, accountants (other than

E&Y), underwriters, financial or investment advisors or agents, heirs, executors, trustees, general

or limited partners or partnerships, personal representatives, estates or administrators.

## THE E&Y SETTLEMENT

15.    In full settlement of the Action against E&Y, E&Y will pay $335,000,000 in cash (the "E&Y Settlement Amount").

16.    The E&Y Settlement Amount will earn interest for the benefit of the Class. E&Y either shall deposit the E&Y Settlement Amount into an interest-bearing Escrow Account by April 14, 2000, or shall pay interest at the rate of 5% per annum on any undeposited portion from April 15, 2000 until the full amount of the E&Y Settlement Amount is deposited into Escrow. The E&Y Settlement Amount, plus all accrued interest, shall be deposited into the Escrow Account no later than 90 days after this Court approves the E&Y Settlement.

17.    The E&Y Settlement is conditioned on the closing of a transaction between E&Y and Cap Gemini S.A., in which Cap Gemini will buy the consulting business of E&Y (the "Transaction"). The contract for the Transaction has been executed, and E&Y has informed Lead Counsel that the Transaction is scheduled to close by June 12, 2000.

18.    Under the E&Y Settlement, Class Members will release all claims that were filed or that could have been filed in the Action against E&Y and its past, present, and future parent entities, affiliates, subsidiaries, predecessors, and successors, and each of their agents, employees, assigns, insurers, partners, heirs, executors, trustees, and administrators, as well as the personal representatives, estates, administrators, families, and spouses of each of their partners, employees, and agents will be released.

7

## FACTUAL BACKGROUND

19.     This Action concerns a series of materially false and misleading statements issued
by CUC and Cendant during the period from May 31, 1995 through August 28, 1998 (the "Class
Period") which, among other things, reported fraudulently manipulated quarterly and annual
financial results for CUC and Cendant.

20.     Cendant was formed through the merger of CUC and HFS Incorporated ("HFS") on
December 17, 1997 (the "Merger"), in which approximately 440 million shares of CUC common
stock were issued to holders of common stock of HFS.  The Merger was accomplished pursuant to
a Registration Statement filed with the SEC on or about August 28, 1997 (the "Registration
Statement"), and a Joint Proxy Statement and Prospectus (the "Joint Proxy Statement/Prospectus")
dated August 28, 1997 that was distributed to shareholders of CUC and HFS on or about August 29,
1997.  Pursuant to the terms of the Merger, holders of HFS common stock received 2.4031 shares
of CUC stock for each share of HFS stock.  Over 183 million shares of HFS common stock were
exchanged for approximately 403 million shares of CUC common stock.  Holders of CUC common
stock did not exchange their stock as part of the Merger, although their approval and approval by
HFS stockholders, was required to consummate the Merger.  CUC remained as the surviving
company following the Merger; its name was changed to Cendant.

21.     Cendant is one of the foremost consumer and business services companies in the
world.  Except for a series of divestitures that Cendant undertook after the end of the Class Period,
the Company provides all of the services formerly provided by CUC and HFS, including technology-
driven membership-based consumer services, travel services and real estate services.  Before the
Merger, CUC conducted membership activities through its Comp-U-Card division ("Comp-U-Card")

and, as of December 1997, through approximately twenty wholly-owned subsidiaries located throughout the United States and Europe. After the Merger, CUC became Cendant Membership Services ("CMS"), a wholly-owned subsidiary of Cendant. The financial statements of CUC for the years ended January 31, 1996 and 1997 and the financial statements of CMS for the year ended December 31, 1997 each were audited by defendant E&Y. CMS's 1997 financial statements were consolidated into Cendant's consolidated financial statements, and were included in Cendant's Form 10-K for the year ended December 31, 1997.

## CENDANT'S REVELATION OF ITS
## AND CUC'S FRAUDULENT SCHEME

22.     After the close of the market on April 15, 1998, the Company stunned investors by issuing a press release announcing that it would restate its previously reported financial results for 1997 and that it might restate financial results for certain other periods, because of unspecified accounting irregularities related to business segments of CUC. The Company stated that it would reduce reported net income for 1997, before restructuring and unusual charges, by $100 million to $115 million, which would reduce by $0.11 to $0.13 previously reported earnings per share. Cendant also stated that the Company's Audit Committee had retained the law firm of Willkie Farr & Gallagher ("WF&G") as special legal counsel to investigate the accounting irregularities, and that WF&G had retained the accounting firm of Arthur Andersen LLP ("AA") to perform an independent investigation. Cendant's auditor, Deloitte & Touche, LLP ("D&T"), was retained to audit the Company's restated financial statements. Because of the accounting irregularities and the restatement, the Company warned that, "[i]n accordance with [Statement on Auditing Standards] No. 1, the Company's previously issued financial statements and auditors' reports should not be

9

relied upon. Revised financial statements and auditors' reports will be issued upon completion of the investigations."

23.     On May 5, 1998, the Company issued a press release announcing its earnings for the quarter ended March 31, 1998. Cendant stated that "[m]ore than eighty percent of the Company's net income for the first quarter of 1998 came from Cendant business units not impacted by the potential [CUC] accounting irregularities." In a later-issued May 5, 1998 press release, Cendant stated that its earlier announced quarterly results "were compiled in accordance with what Cendant believes are appropriate accounting practices, and reflect the elimination of any potential historical accounting irregularities under investigation by the Audit Committee."

24.     On the morning of July 14, 1998, Cendant announced that the Company's previously reported restatement of 1997 financial results was materially understated, and then estimated that the 1997 restatement would reduce net income by $0.22 to $0.28 per share, or *double* the amount reported on April 15. Cendant also announced that it would restate CUC's previously reported financial results for 1995 and 1996 and all quarters in both of those years. Cendant disclosed that the reasons for the restatements included irregular charges against merger reserves, false coding of services sold to customers, delayed recognition of membership cancellations and quarterly recording of fictitious revenue (which occurred in all quarters in the Class Period). The Company also admitted that "[t]hese accounting practices were widespread and systemic and affected the accounting records of all the major business units of CUC."

25.     On July 28, 1998, Cendant announced that Walter Forbes had resigned his position as Chairman of the Board of Directors, and that eight other Cendant directors who had been directors of CUC also had resigned.

10

26.     On August 13, 1998, Cendant announced its results for the quarter ended June 30, 1998. The Company announced that its investigation into accounting irregularities had concluded, and that a complete report would be released later in August 1998.

27.     On August 27, 1998, Cendant announced that the Report to the Audit Committee of the Board of Directors of Cendant Corporation, dated August 24, 1998 (the "Report"), which described details about the massive and pervasive financial fraud at the Company and its restatement of financial statements for 1995, 1996 and 1997, had been issued by WF&G and AA and had been adopted by Cendant's Board. The Company stated that it would file the Report on Form 8-K, and that the Report would be sent to the SEC and to the Office of the U.S. Attorney for the District of New Jersey, both of which were investigating the accounting and reporting irregularities at the Company.

28.     On August 28, 1998, Cendant filed with the SEC on Form 8-K, which attached the Report. The Report  *for the first time* – expressly confirmed that CUC's acts of financial malfeasance "were pervasive," affecting 17 of CUC's 22 operating units. The Report also disclosed that CUC's reported operating income was artificially increased during the Class Period by approximately $500 million as a result of adjusting journal entries that were unsupported and not permitted under GAAP. Indeed, the Report revealed that CUC created hundreds of millions of dollars of fictitious revenue by processing hundreds of unsupported journal entries and that it materially increased its reported cash, accounts receivable and deferred revenue balances. In addition, improper entries were made on a quarterly basis: in 1995, 1996 and 1997, quarterly operating income was fraudulently increased by $31 million, $87 million and $176 million, respectively. The Report characterized the irregularities at CUC as "pervasive," and stated that "the

11

purpose of many of the irregularities was at least to conform CUC's publicly-reported results to Wall Street's earnings expectations."

29.     In the Report, Cendant also disclosed that CUC's false financial reporting was "a carefully planned exercise," as most of the hundreds of unsupported journal entries were made after the ends of years or quarters and backdated to prior months.  Merger reserves were transferred through intercompany accounts to and among various subsidiaries and then reversed into those subsidiaries' net income.  In a repeat of its 1989 improper membership acquisition cost accounting practice, CUC also improperly recorded revenues on an accelerated basis in relation to its recognition of the expenses associated with those revenues.  This was accomplished, in large part, by arbitrarily re-labeling revenues from certain products at Comp-U-Card, where revenues and expenses were recognized over time, to other Comp-U-Card products where revenues were recognized immediately while related expenses continued to be deferred.  CUC's membership cancellation reserve was, also, used improperly during the Class Period, despite being substantially understated, to increase income through unsupported and backdated journal entries.

## CENDANT'S RESTATEMENT OF ITS
## PREVIOUSLY ISSUED FINANCIAL STATEMENTS

30.     On September 29, 1998, Cendant filed with the SEC its Form 10-K/A for the year ended December 31, 1997 (the "10-K/A") to restate its previously issued financial statements as a result of the accounting irregularities and financial fraud.  The financial statements included in the 10-K/A were audited by D&T.  In the 10-K/A, Cendant admitted that, during the Class Period, it had overstated income from continuing operations before income taxes by approximately $297.2 million, or 24%, and earnings per share by $0.61, or 130%.  In Footnote 3 to the consolidated financial

statements included in the 10-K/A, Cendant disclosed the amounts by which its calendar years 1995, 1996 and 1997 financial statements, which reflect the two companies (*i.e.*, CUC and HFS) on a pooled basis, as if they had always been one entity, had been materially inflated.

31.     CUC and E&Y represented that CUC's 1995 and 1996 annual financial statements, which were incorporated in the Registration Statement and the Joint Proxy Statement/Prospectus, were presented in conformity with GAAP. They were not. In fact, those financial statements were materially false and misleading. CUC's income from continuing operations before income taxes for 1995, previously reported as approximately $276.2 million, was overstated by approximately $114.9 million, or 95%; CUC's income from continuing operations before income taxes for 1996, previously reported as approximately $235.3 million, was overstated by approximately $134.5 million, or 95%. CUC's earnings per share for those years were overstated by approximately $0.24 and approximately $0.19, or 140% and 105%, respectively.

32.     Cendant also restated CUC's previously reported quarterly financial statements for each quarter in the years ended December 31, 1995, 1996 and 1997, although the 10-K/A disclosed restated amounts only for each quarter in 1996 and 1997. On or about October 13, 1998, Cendant filed with the SEC Forms 10-Q/A for the first and second quarters of 1998.

33.     In sum, CUC and Cendant issued the following materially false and misleading statements:

        a.     The 1995, 1996 and 1997 Forms 10-K;

        b.     The Forms 10-Q for the first three quarters of 1995, 1996 and 1997 and for the first and second quarters of 1998;

13

  c. The Registration Statement and the Joint Proxy Statement/Prospectus, which incorporated by reference CUC's materially misleading 1996 financial statements.

  d. Registration Statements on Forms S-3 and S-4, each of which included or incorporated by reference materially false and misleading CUC or CMS financial statements or financial information, during the period July 28, 1995 through April 3, 1998.

  e. Press releases in which CUC and Cendant announced each of their quarterly and annual earnings during the Class Period.

## THE MARKET'S REACTION TO CENDANT'S AND CUC'S FRAUDULENT SCHEME

34. On April 15, 1998, immediately prior to the first public disclosure of the financial wrongdoing, the closing market price of Cendant's common stock was $35⅝ on the New York Stock Exchange. On April 16, 1998, the day after the Company's first disclosure, the per share price of Cendant's common stock dropped $16⁹/₁₆ to $19¹/₁₆ on New York Stock Exchange record trading of approximately 108.5 million shares, or by 47%. On July 14, 1998, the date of Cendant's next disclosure, the per share price of Cendant's common stock dropped another $3⅜ to $15¹¹/₁₆. On August 31, 1998, the first trading day after the Company's detailed disclosure of its financial wrongdoing, the per share price of Cendant's common stock dropped another $4 to $11¹¹/₁₆.

35. Lead Plaintiffs' damages expert, Forensic Economics, Inc., as set forth below, has determined that reasonable damages to the Class are approximately $8.5 billion. (*See* Affidavit of Frank C. Dorkey, sworn to May 3, 2000 ("Dorkey Aff.") at ¶10.)

14

## HISTORY OF THE LITIGATION

### THE INITIAL COMPLAINTS AND CONSOLIDATION

36.     Following Cendant's April 15, 1998 announcement, 54 actions were filed in the United States District Court for the District of New Jersey (the "Court"). In addition, 5 actions were filed in the United States District Court for the District of Connecticut, 1 action in the United States District Court or the Eastern District of Pennsylvania and 1 action in the Morris County Superior Court.

37.     The actions that were not filed in federal court in New Jersey either were voluntarily discontinued, voluntarily transferred to the District of New Jersey, or were voluntarily dismissed and refiled in the District of New Jersey.

38.     On May 26, 1998, a motion was made to consolidate all actions filed in the District of New Jersey. By Order entered June 1, 1998 (the "Consolidation Order"), the Court consolidated all actions.

### APPLICATIONS FOR APPOINTMENT OF LEAD PLAINTIFF AND APPROVAL OF LEAD COUNSEL

39.     On June 11, 1998, pursuant to provisions of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. §78u-4, the NYSCRF, CalPERS and the NYCPF filed a motion in the District of New Jersey for appointment as lead plaintiff and the approval of their choice of counsel, BLB&G and BR&B, as lead counsel.

      a.     The NYSCRF holds and invests the assets of the New York State and Local Employees' Retirement System and the New York State and Local Police and Fire Retirement System. The NYSCRF, the second largest public pension fund in the nation, has

15

approximately 280,000 retiree and 580,000 active members and, as of March 31, 1998, held approximately $105 billion in assets. The NYSCRF purchased or acquired over 3.7 million shares of CUC and Cendant common stock during the Class Period for over $103.9 million, including over 730,000 shares of HFS common stock exchanged for over 1.7 million shares of CUC common stock in connection with the Merger.

     b.     CalPERS is the largest public pension system in the nation, holding more than $141.9 billion in assets as of April 30, 1998. It provides retirement and health benefits to more than 1 million state and local public employees, retirees and their families, from more than 2,400 employers. CalPERS purchased or acquired over 3.7 million shares of CUC and Cendant common stock during the Class Period for over $107 million, including approximately 546,000 shares of HFS common stock exchanged for over 1.3 million shares of CUC common stock in connection with the Merger.

     c.     The NYCPF, the largest municipal pension fund in the U.S., consist of the actuarial pension systems of New York City, including the New York City Employees' Retirement System, the Police and Fire Department Pension Funds, the Teachers and Board of Education Retirement Systems and four variable supplements funds. As of March 31, 1998, the NYCPF held over $102 billion in assets. As of June 30, 1996, the NYCPF had approximately 234,000 retiree and 311,000 active members. Collectively, the NYCPF purchased or acquired approximately 4.3 million shares of CUC and Cendant common stock during the Class Period for over $131.9 million, including approximately 779,000 shares of HFS common stock exchanged for over 1.8 million shares of CUC common stock in connection with the Merger.

16

Fifteen other lead plaintiff motions were filed in the District of New Jersey.

40.     On or about July 9, 1998, the NYSCRF, CalPERS and the NYCPF filed in the District of New Jersey their memorandum of law in opposition to the competing motions for the appointment of lead plaintiff, as did the other lead plaintiff applicants.

41.     On or about July 10, 1998, the law firm of Goldstein Lite & DePalma moved, pursuant to Local Rule 7.1, for its appointment as liaison counsel. On or about July 24, 1998, the NYSCRF, CalPERS and the NYCPF filed their memorandum of law in opposition to the motion for the appointment of liaison counsel. On or about July 29, 1998, Goldstein Lite & DePalma filed its reply brief in support of its motion for appointment as liaison counsel.

42.     Also on or about July 29, 1998, the NYSCRF, CalPERS and the NYCPF filed their reply brief in further support of their motion for appointment as lead plaintiff and approval of their choice of lead counsel. On or about the same date, the other lead plaintiff applicants filed their own reply briefs.

43.     The PSLRA, which governs this Action, directs the Court to appoint the "most adequate plaintiff" to serve as lead plaintiff and, in making this determination, to presume that the "most adequate plaintiff" is the person, or group of persons, that "has the largest financial interest in the relief sought by the class and otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." *See* 15 U.S.C. §78u-4(a)(3)(B)(iii)(I). The PSLRA was designed to encourage institutional and other large investors, particularly public pension funds such as the NYSCRF, CalPERS and the NYCPF, to serve as lead plaintiff. As the Statement of Managers noted, Congress hoped that the provisions of the PSLRA would "increase the likelihood that institutional investors will serve as lead plaintiffs" because, among other reasons, institutional investors and other

17

class members with large amounts at stake "will represent the interests of the plaintiff class more effectively than class members with small amounts at stake." House Conference Report No. 104-369, 104th Cong. 1st Sess. at 34 (1995), 1995 WL 709276 at 30.

44.    On August 4, 1998, the Court held a hearing on the motions for the appointment of lead plaintiff, approval of lead counsel and appointment of liaison counsel. At the August 4, 1998 hearing, the Court announced the appointment of the NYSCRF, CalPERS and the NYCPF as lead plaintiffs for the claims of all purchasers or acquirers of CUC or Cendant publicly traded securities other than PRIDES. The Court also denied Goldstein Lite & DePalma's motion for appointment as liaison counsel. By Order entered September 8, 1998, the Court (a) appointed the NYSCRF, CalPERS and the NYCPF as lead plaintiffs for the claims of all purchasers or acquirers of CUC or Cendant publicly traded securities other than PRIDES; and (b) denied the motion for the appointment of liaison counsel.

45.    At the August 4, 1998 hearing, as later confirmed by the September 8, 1998 Order, the Court also stated that it would select Lead Counsel for the Action only after a process where interested law firms, whether or not then representing any plaintiff in the consolidated actions, would submit competitive bids under guidelines provided by the Court, including submitting qualifications and proposals for fees to be paid. The Court stated that it would select the lowest qualified bid, and invited all interested attorneys to submit bid grid guidelines in advance of an August 19, 1998 hearing among interested counsel (without defense counsel) and to attend that hearing.

46.    The NYSCRF, CalPERS and the NYCPF, as the Court-appointed Lead Plaintiffs, submitted a letter to the Court in which they expressed their concerns (a) that the auction process would result in the Court compelling Lead Plaintiffs to prosecute the Action with attorneys they did

18

not choose and, in fact, with whom they may have conflicts, and (b) that the retainer agreement Lead Plaintiffs had entered into with BLB&G and BR&B contained important reporting provisions that any counsel selected through the bidding process should be willing to honor.

47.     On August 19, 1998, the Court held the scheduled hearing on the format of the bid grid and the conduct of the auction. Counsel for many of the plaintiffs appeared, as indicated in the transcript of the hearing.

48.     By letters dated August 27 and 28, 1998, the Court provided all interested counsel with instructions on the auction and set forth the bid-grid format and bidding guidelines to be used in those submissions. Bids were required to be submitted *in camera* by no later than 4:00 pm EDT on September 17, 1998.

49.     On or about September 17, 1998, BLB&G and BR&B submitted their joint competitive bid in compliance with the Court's directions. Under the Court's September 8, 2000 Order, if the Court determined BLB&G and BR&B to be the lowest qualified bidder, then BLB&G and BR&B, as previously selected counsel for Lead Plaintiffs, would have been appointed lead counsel for the Class except purchasers of PRIDES. The Order further provided that, in the event the Court determined another law firm to be the lowest qualified bidder, then BLB&G and BR&B, if determined by the Court to be otherwise qualified, would be provided the opportunity to agree to the terms of that lowest qualified bid, and, if BLB&G and BR&B accepted those terms, the Court would appoint BLB&G and BR&B as lead counsel for the Class except purchasers of PRIDES.

50.     Following extensive publication of the competitive bidding procedure adopted by the Court, 12 separate bids for the appointment of lead counsel were submitted from different law firms (some not previously representing any plaintiffs in the Action). The Court considered these bids in

19

detail, both in connection with attorney qualifications and the amount of the bids, as described in the Court's Opinion dated October 2, 1998 (which was unsealed with respect to the non-PRIDES portions of the opinion on April 7, 2000, the date the Notice of Settlement was mailed to Class Members, in order to maintain adversarial integrity during the prosecution of this Action). The Court found that BLB&G and BR&B were qualified to represent the Class, but that our bid was not the lowest. The Court determined that the following bid was the lowest qualified bid of the 12 submitted:

| | | PHASE AT WHICH LITIGATION IS RESOLVED | | | |
|---|---|---|---|---|---|
| | | During pleadings through adjudication of any motion to dismiss | During discovery through adjudication of S.J. motion | After adjudication of SJ motion through trial verdict | Post-trial |
| **R E C O V E R Y   I N C R E M E N T   I N D O L L A R S** | First 100 million | 2.0% | 2.0% | 3.0% | 3.0% |
| | Second 100 million | 3.0% | 3.0% | 4.0% | 4.0% |
| | Third 100 million | 4.0% | 4.0% | 5.0% | 5.0% |
| | Next 50 million | 5.0% | 5.0% | 6.0% | 6.0% |
| | Next 50 million | 6.0% | 6.0% | 7.0% | 7.0% |
| | Next 50 million | 7.0% | 7.0% | 8.0% | 8.0% |
| | Next 50 million | 8.0% | 8.0% | 9.0% | 9.0% |
| | Over 500 million | 9.0% | 9.0% | 10.0% | 10.0% |

51.     In accordance with its September 8, 1998 Order, the Court allowed BLB&G and BR&B to "match" the bid and agree to the terms of what the Court found to be the lowest qualified bid. *See* September 8, 1998 Order at 15. By letter dated October 8, 1998, BLB&G and BR&B

agreed to match the lowest qualified bid, and, by Order entered October 14, 1998, the Court appointed BLB&G and BR&B Lead Counsel for Lead Plaintiffs and the Class, and held that the results of the auction would serve as a benchmark of reasonableness.

## MOTION TO RECONSIDER THE COURT'S LEAD PLAINTIFF APPOINTMENT

52.     On or about August 14, 1998, DSJ International Resources Ltd. Profit Sharing Plan ("DSJ"), one of the unsuccessful lead plaintiff applicants, moved the Court to reconsider the Court's August 4, 1998 determination (which had been announced at the hearing held on that date but not yet released by Order) to appoint only one lead plaintiff group as lead plaintiff for the consolidated Action. DSJ claimed that it should be appointed lead plaintiff for what it referred to as the "open market" purchasers of Cendant common stock. According to DSJ, the interests of Lead Plaintiffs, which obtained many of their Cendant shares in exchange for shares of HFS common stock in connection with the Merger, and which continued to hold a substantial portion of those shares, were not aligned with "open market" purchasers, like DSJ, who purchased their Cendant shares on the open market and who no longer held their shares.

53.     On or about August 21, 1998, Lead Plaintiffs filed their memorandum in opposition to DSJ's motion for reargument.

54.     On or about September 4, 1998, DSJ filed its reply brief in further support of its motion, together with a supporting affidavit.

55.     On or about September 10, 1998, Lead Plaintiffs moved the Court to strike DSJ's reply memorandum of law and the supporting affidavit.

21

56.     On September 14, 1998, the Court held a hearing on DSJ's motion. The Court denied

DSJ's motion from the Bench, which denial was confirmed by Order filed September 15, 1998.

**MOTIONS TO ESTABLISH A SEPARATE CLASS
FOR PURCHASERS OF CENDANT COMMON STOCK
MADE BETWEEN APRIL 15, 1998 AND JULY 14, 1998**

57.     On or about September 8, 1998, a motion was made on behalf of plaintiff Dr. Lisa

Lewis, to clarify and/or modify an August 24, 1998 Order that, pursuant to the Court's June 1, 1998

Consolidation Order, consolidated into this Action her action filed after the June 1, 1998 Order was

entered. Lewis sought the appointment of a separate lead plaintiff for all persons who purchased

Cendant common stock after April 15, 1998 through July 14, 1998.

58.     On or about September 11, 1998, Alan Casnoff also moved  for the appointment of

separate lead plaintiffs for persons who purchased shares of Cendant common stock after April 15,

1998 through July 14, 1998.

59.     On or about September 29, 1998, Lead Plaintiffs filed their memorandum of law in

opposition to the Lewis and Casnoff motions.

60.     On or about October 8, 1998, Lewis and Casnoff filed a joint reply brief in further

support of their motions.

61.     On October 23, 1998, the Court held a hearing on the Lewis and Casnoff motions.

The Court denied the Lewis and Casnoff motions from the Bench, which denial was confirmed by

Order entered November 6, 1998.

**THE FILING OF LEAD PLAINTIFFS'
AMENDED AND CONSOLIDATED COMPLAINT,
MOTION FOR CLASS CERTIFICATION AND
MOTION FOR PARTIAL SUMMARY JUDGMENT**

62.    On December 14, 1998, Lead Plaintiffs filed an Amended Consolidated Class Action Complaint on Behalf of Purchasers and Acquirers of All Cendant and CUC Publicly Traded Securities except PRIDES (the "Complaint"). The Complaint alleges violations of the Securities Act of 1933 (the "Securities Act") and of the Securities Exchange Act of 1934 (the "Exchange Act") by the following Defendants:

        a.    Cendant;

        b.    The CUC Individual Defendants;

        c.    The HFS Individual Defendants; and

        d.    E&Y.

63.    The Complaint asserts claims against Defendants as follows:  against Cendant for violations of §§ 11 and 12(a)(2) of the Securities Act, and § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; against the CUC Individual Defendants (except Pember) for violations of § 11 of the Securities Act; against the HFS Individual Defendants for violations of § 11 of the Securities Act; against E&Y for violations of § 11 of the Securities Act; against Walter Forbes, Corigliano and McLeod for violations of § 15 of the Securities Act; against Walter Forbes, Shelton, McLeod, Corigliano and Pember for violations of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and § 20(a) of the Securities Exchange Act; against Silverman, Snodgrass, Monaco, Buckman and Scott Forbes for violations of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and § 20a of the Exchange Act; against E&Y for violations of

23

§ 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; against Walter Forbes, Shelton, McLeod, Corigliano, Silverman, Snodgrass and Buckman for violation of § 20A of the Exchange Act; and against Cendant, the HFS Individual Defendants (except Scott Forbes) and the CUC Individual Defendants (except Pember) for violations of § 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

64.     Contemporaneously with the filing of the Complaint on December 14, 1998, Lead Plaintiffs also:

a.     Moved the Court, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, to certify a class (the "Class") as follows: All persons and entities who purchased or otherwise acquired publicly traded securities (other than PRIDES) of either Cendant or CUC during the period beginning May 31, 1995, through and including August 28, 1998 (the "Class Period"), and who were injured thereby. Excluded from the Class are: (a) defendants; (b) members of the family of each individual defendant; (c) any entity in which any defendant has a controlling interest; (d) officers and directors of Cendant and its subsidiaries and affiliates; and (e) the legal representatives, heirs, successors or assigns of any such excluded party; and

b.     Moved the Court for partial summary judgment on liability only against Cendant under Section 11 of the Securities Act.

65.     Through negotiations with Cendant, Lead Plaintiffs obtained Cendant's agreement (a) not to oppose class certification and (b) to provide Lead Plaintiffs with photocopies of documents while the motions to dismiss were pending. In return, Lead Plaintiffs agreed to place their motion for partial summary judgment on the Court's suspense docket. Absent this agreement, Lead

24

Plaintiffs would have moved forward with their motion for partial summary judgment, and likely would have faced Cendant's opposition to the class certification motion *and* Cendant's argument that, under the discovery stay provisions of the PSLRA, Lead Plaintiffs were not entitled to any discovery until after all motions to dismiss were adjudicated.

66.     In fact, the only defendant to oppose class certification was E&Y, which, on or about January 13, 1999, filed its memorandum of law in opposition to class certification.  On or about January 26, 1999, Lead Plaintiffs filed their reply memorandum of law in further support of their motion for class certification. After filing their reply memorandum of law, Lead Plaintiffs convinced E&Y to withdraw its opposition to class certification.

67.     By Order entered January 28, 1999, the Court granted Lead Plaintiffs' motion to certify the Class as not opposed.

### ANSWERS TO THE COMPLAINT AND MOTIONS TO DISMISS

68.     Defendants responded to the Complaint as follows:

a.      Cendant, Walter Forbes, Shelton, Corigliano and Pember answered the Complaint; in their answers, these defendants denied all wrongdoing alleged in the Complaint, and raised affirmative defenses.

b.      The HFS Individual Defendants moved to dismiss, for failure to state claims for relief, four of the five claims that were asserted against them; they did not move to dismiss the claim that they violated § 11 of the Securities Act in connection with the Joint Proxy Statement/Prospectus.

25

     c.     Burnap, Donnelley, Greyser, Perfit, Rittereiser, Rumbough, Williams and McLeod moved to dismiss for failure to state claims for relief all claims asserted against them.

     d.     E&Y moved to dismiss the Complaint as having no legal or factual basis against E&Y.

69.     On or about April 16, 1999, Lead Plaintiffs filed four memoranda of law in opposition to the motions to dismiss filed by the HFS Individual Defendants, by the CUC Individual Defendants (except McLeod), by McLeod and by E&Y.

70.     On or about May 7, 1999, the HFS Individual Defendants, the CUC Individual Defendants, McLeod and E&Y filed their respective reply memoranda of law in further support of their motions to dismiss the Complaint.

71.     On or about June 10, 1999, Lead Plaintiffs took the unusual but necessary step of moving the Court for leave to file a surreply brief. Lead Plaintiffs explained that they needed such a memorandum of law to address the applicability to the pending motions to dismiss of the Court's April 30, 1999 decision in *P. Schoenfeld Asset Management LLC v. Cendant*, Civ. No. 98-4734 (WHW), in which the Court had concluded, *inter alia*, that there were no valid claims against any Defendant for securities purchased after April 15, 1998. Lead Plaintiffs' memorandum of law in opposition to the several motions to dismiss the Complaint had been filed *before* the Court's decision in *Schoenfeld*, but the various reply memoranda of law had been filed *after* that decision, and had relied upon *Schoenfeld* for their argument that all claims for Cendant securities purchased after April 15, 1998 should be dismissed.

72. By Order entered June 14, 1999, the Court granted Lead Plaintiffs' motion for leave to file a surreply brief directed solely to the issue of whether the Section 10(b) claims of purchasers of Cendant publicly traded securities after April 15, 1998 should be dismissed.

73. On or about June 18, 2000, Lead Plaintiffs filed their surreply brief in which they explained why claims for purchases of Cendant publicly traded securities made after April 15, 1998 should not be dismissed. As described in the next paragraph, those arguments were successful.

74. On July 8, 1999, the Court held a hearing on the various motions to dismiss the Complaint. From the Bench, as confirmed by Order and Opinion dated July 27, 1999, the Court denied all of the motions to dismiss in their entirety, including motions to dismiss claims for purchases after April 15, 1998, except that the Court granted E&Y's motion to dismiss the claims brought against it under Section 10(b) of the Exchange Act and Rule 10b-5 solely for purchases of Cendant publicly-traded securities made after April 15, 1998, because on that date Cendant announced that E&Y's auditors' reports could no longer be relied upon, and E&Y made no public statements after April 15, 1998.

75. These were significant rulings in favor of the Class. Subsequently, all Defendants that had not answered the Complaint – the HFS Individual Defendants, the CUC Individual Defendants and E&Y – filed their Answers denying any wrongdoing and asserting numerous affirmative defenses.

## MOTIONS TO STAY THE ACTION

76. On or about June 11, 1999, while the motions to dismiss the Complaint were pending, Casper Sabatino, a former CUC employee who was named as a third-party defendant by E&Y in

27

E&Y's third-party complaint, moved the Court for a stay of proceedings against him because he was a subject of a pending federal criminal investigation into the accounting irregularities at Cendant and CUC.

77. By letter to the Court of June 24, 1999, E&Y sought to delay consideration of Sabatino's motion. By letter dated June 25, 1999, the Court denied E&Y's request, and queried whether the other three third-party defendants named by E&Y in its third-party complaint, namely, Steven Speaks, Mary Sattler (Polvarari) and Kevin Kearney, should join Sabatino's motion.

78. On or about June 28, 1999, E&Y responded to Sabatino's stay motion by asking the Court to stay the Action against E&Y in the event the Court granted Sabatino's motion or, in the alternative, to reconsider the Court's June 25, 1999 determination not to postpone hearing Sabatino's motion.

79. On or about July 2, 1999 and July 7, 1999, Speaks, Kearney and Sattler each joined Sabatino's motion seeking a stay of E&Y's third-party action against them because they were subjects of the Government's investigation into criminal conduct at CUC and Cendant.

80. On or about July 13, 1999, Sabatino filed his letter reply brief in further support of his stay motion.

81. On or about July 14, 1999, Lead Plaintiffs, recognizing that any stay of the Action against E&Y would hinder Lead Plaintiffs' prosecution of the Action against the other Defendants, and, perhaps, would result in a stay of the Action in its entirety, opposed E&Y's motion.

82. Also on or about July 14, 1999, E. Kirk Shelton, one of the Defendants named in the Complaint, responded to Sabatino's and E&Y's motions by also seeking a stay of the Action against

28

him if the Court granted a stay as to any other party.  Similarly, Cendant and the HFS Individual Defendants cross-moved to stay the Action if E&Y's motion was granted.

83.     On or about July 20, 1999, following on the heels of these stay motions, the U.S. Attorney's Office sought to intervene in the Action for the sole purpose of seeking a six month stay of all proceedings in the Action.  The Government claimed that any discovery in the Action would prejudice its criminal investigation and potential prosecution of criminal charges.

84.     Lead Plaintiffs vigorously opposed these stay motions, filing a memorandum of law in opposition to the cross-motion by Cendant and the HFS Individual Defendants, and a separate memorandum of law in opposition to the Government's application.  Lead Plaintiffs pointed out that no movant had sufficiently demonstrated the prejudice necessary to warrant a stay, and, that in the event the Court might impose a stay, it should be only a temporary partial stay one that permitted Lead Plaintiffs to conduct document discovery.  Lead Plaintiffs further noted a public statement by one of the defendants that made clear that a stay of proceedings would greatly prejudice the Class.

85.     On July 27, 1999, the Court heard oral argument on these motions.  From the Bench, as later confirmed by Order entered August 2, 1999, the Court ruled that the Government could intervene, but denied all motions seeking a stay, except that, solely with respect to any person who is a *target* of the federal criminal investigation into accounting irregularities at Cendant and CUC, all discovery seeking testimony of such person would be stayed so long as that person is a target. The Court also held that the parties must provide to the Government reasonable advance notice of any depositions so that the Government could, if necessary, seek appropriate relief from the Court. This ruling was another important victory for the Class, as it allowed Lead Counsel to "keep the pressure" on defendants.

29

**NOTICE OF PENDENCY OF CLASS ACTION**

86. After the Court certified the Class, Lead Counsel attempted to obtain the agreement of all parties on (a) the language of a notice to be sent to the Class; (b) the language of a notice to be published; and (c) a procedure that would comport with Rule 23(c) and due process for providing notice to Class Members of the pendency of this action as a class action.

87. To accomplish this, by letter dated May 13, 1999, Lead Plaintiffs sent to Defendants drafts that Lead Counsel had prepared of a Notice of Pendency of Class Action, a Summary Notice of Pendency of Class Action, and a [Proposed] Order Concerning Notice of Pendency of Class Action, and sought their comments.

88. In response, Lead Plaintiffs received comments on the Notice from *only two* defendants: E&Y and Cendant:

a. In a letter dated May 26, 1999 (copied to all counsel in the Action), E&Y gave its comments on the drafts. In one comment, E&Y sought to require Class Members to complete and submit proofs of claim upon receipt of the Notice of Pendency in order to participate in any recovery.

b. Cendant provided comments on the draft notices orally via a telephone conversation on or about May 26, 1999. Cendant was informed that Lead Plaintiffs would revise the draft notices to reflect Cendant's comments and suggestions. During the conversation, Cendant acknowledged that Cendant knew of E&Y's suggestion to require Class Members to return a proof of claim in order to participate in any recovery. In response, Lead Counsel informed Cendant's counsel that such a requirement was contrary to Rule 23

30