of the Federal Rules of Civil Procedure, because it impermissibly converted an "opt-out" class into an "opt-in" class, and, therefore, that Lead Plaintiffs would not agree to include such a requirement. Cendant's counsel said that Cendant was thinking about whether it would join in E&Y's position on the matter.

89.     By May 26, 1999, Lead Plaintiffs had received no other comments on the draft notices from any other Defendant. Accordingly, by letter of that date, Lead Plaintiffs advised Defendants that, thus far, Lead Plaintiffs only had received comments from Cendant and E&Y, and stated in that letter that any Defendant that wished to comment on the notices or notice procedure should do so by June 1, 1999.

90.     Lead Plaintiffs received no additional comments by June 1, 1999. Accordingly, by letter dated June 3, 1999, Lead Plaintiffs sent to counsel for Defendants revised drafts of the notices and proposed Notice Order and sought further comments thereon by no later than the close of business on Monday, June 7, 1999. As the June 3, 1999 letter stated, the documents were "redlined to reflect comments and changes that we have received from counsel for Ernst & Young and counsel for Cendant."

91.     In a separate letter dated June 3, 1999, Lead Plaintiffs advised E&Y (with a copy to Cendant) of Lead Plaintiffs' position on E&Y's comments and suggestions as set forth in E&Y's May 26, 1999 letter. Lead Plaintiffs advised E&Y's counsel that Lead Plaintiffs had attempted to incorporate all of E&Y's comments with certain exceptions, which were each described. With respect to E&Y's suggestion that the Notice of Pendency require all Class Members to complete and return a proof of claim form in order to participate in any Class recovery, Lead Plaintiffs stated their strong objection, as follows:

31

Finally, we reject your suggestion that a proof of claim should be submitted to the class with the notice and that the class members be required to file a proof of claim at this point. This is a notice of pendency, not a settlement notice. The Court has certified the action to proceed as an "opt-out" class action, and there is absolutely no requirement under the Rule or attendant case law that, for members of the class to be bound, they file a claim form. If and when the action, or any part of it, is settled, there will be sufficient time to solicit claim forms from class members. At this point, the only requirement imposed by Rule 23 is that class members be notified of the pendency of the action; that they may be excluded from the class [if] they so request; that class members who do not request exclusion will be bound by any judgment; and that any class member may, should they so desire, enter an appearance in the case. Fed. R. Civ. P. 23 (c)(2).

92.     In a letter dated June 16, 1999 (with a copy to Cendant), E&Y provided its comments on the revised drafts. E&Y continued to suggest a requirement of a proof of claim.

93.     Lead Plaintiffs also received a few additional language comments on the revised draft notices from Cendant orally in another telephone conversation after June 3, 1999. These changes were made to the documents.

94.     Lead Plaintiffs and E&Y discussed by telephone E&Y's comments on the revised notices. As a result of these discussions, E&Y advised that it had decided to withdraw its suggestion to require Class Members to complete and return proof of claim forms in order to participate in any Class relief, and that E&Y consented to submit the notices and the proposed Notice Order to the Court.

95.     Lead Plaintiffs did not receive any other comments on the revised draft notices from any Defendant other than Cendant or E&Y.

96.     After giving Defendants more than a month to provide any comments on the notices or notice procedures, and over two weeks to comment on the June 3 drafts, Lead Plaintiffs moved the Court, by motion dated June 22, 1999 (which was filed with the Court and served on Defendants

32

on June 23, 1999), pursuant to Rule 23(c)(2) of the Federal Rules of Civil Procedure, for approval

of the Notice of Pendency of Class Action and Summary Notice of Pendency of Class Action; and

for the entry of the proposed Order Concerning Notice of Pendency of Class Action.  In paragraph 6

of that motion, Lead Plaintiffs stated: "Plaintiffs believe that there are no objections to the form or

the content of the Notice of Pendency of Class Action, the Summary Notice of Pendency of Class

Action or the [Proposed] Order Concerning Notice of Pendency of Class Action."  Thereafter, Lead

Plaintiffs received no communication in any form from counsel for any defendant in which anyone

commented upon the Notice of Pendency.

97.     As stated above, on July 8, 1998, the Court heard argument on the motions to dismiss

the Complaint, and announced at the conclusion of that hearing its decision to deny all such motions,

except with respect to that portion of E&Y's motion to dismiss §10(b) claims for post-April 15, 1998

purchases of Cendant securities.  Less than a week later, on or about July 13, 1999, Cendant filed

its Brief in Opposition to Lead Plaintiffs' Motion for Approval of Notice of Pendency of Class

Action.  Further, on or about July 14, 1999, the HFS Individual Defendants filed their "Position in

Opposition to Lead Plaintiffs' Motion for Approval of Notice of Pendency of Class Action," even

though they had not previously expressed any views whatsoever on the Notice.

98.     On or about July 20, 1999, Lead Plaintiffs filed their reply memorandum of law in

support of their motion for approval of the Notice of Pendency of Class Action, Summary Notice

of Pendency of Class Action, and for Entry of Order Concerning Notice of Pendency of Class

Action.

99.     On July 27, 1999, the Court held a hearing on Lead Plaintiffs' motion (as well as the

motions to stay proceedings).  From the Bench, as later confirmed by Order Concerning Notice of

33

Pendency entered August 9, 1998 (the "Notice Order"), the Court rejected the requirement proposed by Cendant and the HFS Individual Defendants that Class Members must submit a claim form in order to remain in the Class, and approved the forms of the Notice of Pendency of Class Action and of the Summary Notice of Pendency of Class Action submitted by Lead Plaintiffs, as well as the procedures for administering the Notice that were set forth in the Proposed Order Concerning Notice of Pendency of Class Action.

100.    This was a significant victory for Lead Plaintiffs and the Class, as it prevented Cendant and the HFS Individual Defendants from improperly restricting the Class by requiring Class Members to invest a substantial amount of time to complete and submit a complex claim form just to remain Class Members before there was any recovery for the Class.

101.    Pursuant to the Notice Order, Lead Plaintiffs undertook the following actions:

a.    On October 8, 1999, Lead Plaintiffs, through their Notice Administrator, Heffler, Radetich & Saitta, L.L.P. ("HR&S"), mailed the Court-approved Notice of Pendency of Class Action (the "Notice of Pendency") to 18,689 persons and entities, as identified on the transfer records and other computer records supplied by Cendant for purchasers of Cendant and CUC publicly traded securities (other than PRIDES) during the Class Period, to 141 banks and to 239 brokers, institutional investors and other nominee holders, as described on lists generally maintained by HR&S for such purposes.

b.    On October 18, 1999, Lead Plaintiffs, through HR&S, published the Court-approved Summary Notice of Pendency of Class Action (the "Summary Notice of Pendency") in the national edition of *The Wall Street Journal.*

34

     c.     On October 19, 1999, Lead Plaintiffs, through HR&S, published the Summary Notice of Pendency in *The New York Times*.

     d.     On October 20, 1999, Lead Plaintiffs, through HR&S, published the Summary Notice of Pendency on the *PR Newswire*.

102.     After the initial mailing of the Notice of Pendency, HR&S mailed an additional 38 Notices to persons and entities based on written or telephone requests, and 176,644 Notices of Pendency to persons and entities who were identified as potential Class Members by banks, brokers or other nominee holders. In addition, HR&S sent to brokers and other nominee holders another 65,473 Notices of Pendency to be sent to Class Members by those brokers and other nominee holders. Through November 29, 1999, a total of 261,224 Notices of Pendency were mailed to potential Class Members pursuant to the Notice Order.

103.     HR&S maintained a toll free, or "800," telephone number, as identified in paragraph 22 of the Notice of Pendency, to field calls from potential Class Members. HR&S also maintained an active file of all Class Members who have timely and properly elected to excluded from the Class.

104.     Under the terms of the Notice of Pendency, potential Class Members had until December 27, 1999 to exclude themselves from the Class. Out of the entire mailing of more than 260,000 Notices of Pendency, only 234 requests for exclusion were received. Such persons will be excluded from any judgment entered in the Action.

## DISCOVERY

105.    Lead Plaintiffs, through Lead Counsel, conducted extensive informal and formal pretrial discovery and other investigations in order to thoroughly analyze the facts and claims involved in the Action.

106.    Lead Counsel reviewed and analyzed all public filings, articles and analyst reports concerning CUC, HFS and Cendant, including the analysis of all of CUC's and Cendant's financial statements, restatements, and the WF&G and AA Report tot he Cendant Audit Committee and exhibits thereto.

107.    Immediately after the appointment of Lead Counsel, with the assistance of a private investigations firm, extensively investigated Cendant, each HFS and CUC Individual Defendant, E&Y and the senior E&Y auditors responsible for the CUC and CMS audits and reviews.  This investigation included, among other things, interviews of many former employees of CUC, HFS and E&Y. The investigation was necessary to prosecute the Action prior to the commencement of formal discovery, which, under the PSLRA, was stayed until after each motion to dismiss was adjudicated.

108.    In connection with Lead Plaintiffs putting their motion for partial summary judgment on the Court's suspense docket, Cendant agreed to produce documents prior to formal discovery under the Federal Rules of Civil Procedure.  Lead Counsel sent Cendant a list of documents, pursuant to which Cendant produced all of the documents that it had provided to WF&G and AA in connection with the investigation into the three-year scheme by Cendant, CUC, and their subsidiaries to fraudulently overstate revenue, net income and financial position in financial statements and press releases.  Over almost a year of thorough review by teams of attorneys, these

documents were logged, separated according to their relevance to the various components of the accounting fraud, entered into a document database and analyzed.

109.    To assist in reviewing the vast accounting records relevant to the issues in this Action, understanding the complicated accounting issues implicated by the alleged accounting scheme, and investigating the case of alleged auditing and review failures by E&Y, Lead Plaintiffs retained the accounting firm of Marks Paneth & Shron LLP ("MP&S"), expert forensic accountants. Along with Lead Counsel, MP&S carefully reviewed the Audit Committee Report and exhibits thereto, all of the accounting documents produced by Cendant, and the E&Y working paper files for the audits and reviews conducted by E&Y. MP&S regularly discussed its progress and analysis with Lead Counsel.

110.    Thus, even before formal discovery commenced, Lead Plaintiffs had gained a tremendous wealth of knowledge about the claims in the Action and defendants' likely defenses.

111.    Once formal discovery began, Lead Counsel, served document requests and interrogatories on all defendants, and served subpoenas for production of documents on relevant non-parties:

a.    Cendant produced relevant documents to Lead Plaintiffs, who, through counsel, reviewed and analyzed all such documents for their impact on the Action.

b.    E&Y produced three years of annual and quarterly audit and review working papers to Lead Plaintiffs, who, through counsel and MP&S, reviewed all such documents for their impact on the Action.

c.    Many of the Individual Defendants produced relevant documents to Lead Plaintiffs, who, through counsel, reviewed and analyzed all such documents for their impact on the Action.

37

d.      Willkie Farr & Gallagher, counsel to Cendant's Audit Committee in connection with the Audit Committee's investigation into the fraudulent scheme at CUC and Cendant, produced documents relevant to the investigation, including notes of interviews with most of the key witnesses in the Action. Those documents were similarly reviewed and categorized according to relevancy.

e.      Bear Stearns & Co., advisor to HFS in connection with HFS's merger with CUC, produced documents relevant to the Merger that were similarly reviewed, analyzed and categorized according to relevancy.

## ADDITIONAL BASES FOR SETTLEMENT NEGOTIATIONS

112.    To prepare for and assist with possible settlement discussions with Cendant, Lead Plaintiffs – at Lead Counsel's insistence and urging – retained an investment banker, Lazard Frères & Co. LLC ("Lazard"), and Arthur S. Ainsberg, both as financial consultants, and also retained Forensic Economics, Inc., an expert on economic analysis of damages in securities actions.

113.    At Lead Counsel's urging, Lead Plaintiffs determined that the retention of a highly regarded investment banking firm was necessary in this case both to advise on the current and reasonably anticipated future financial viability of Cendant, and to devise the most advantageous structure (*e.g.*, an all cash settlement or one that combined cash, common stock, convertible debt, etc.) for that settlement. While plaintiffs in securities class actions have not customarily retained investment bankers to assist in structuring a settlement, this case was unusual. Indeed, to our knowledge, this is the *only* securities class action in which a top-tier investment banking firm has been retained by plaintiffs to provide "due diligence" analyses of the corporate defendant, and to

38

assist in settlement negotiations. While Cendant was a solvent company, Lead Plaintiffs and Lead Counsel were not able to determine with sufficient certainty the Company's long-term viability, and could not rely on the Company's representations about its prospects or those of the product lines it offers. As current shareholders and the holders of any additional stock or other securities that may have been issued in connection with a settlement, Lead Plaintiffs would be required to evaluate the effect of common stock dilution for the large amount of shares likely to be issued, and would have to evaluate the effect of debt service on any substantial additional debt Cendant would have to assume. In addition, Lead Plaintiffs were going to negotiate with Cendant, which was being advised by Merrill Lynch.

114. Lead Plaintiffs and Lead Counsel had to have confidence in the long-term effect any settlement was anticipated to have both on the Company's operations and on the market's perception of Cendant. The in-depth analyses performed by an internationally-renown investment banking firm, as if it were performing due diligence on an acquisition target, together with the advice resulting therefrom, would enhance Lead Counsel's ability to negotiate the best possible settlement with Cendant and its present officers and directors, a settlement that would gain the confidence of Lead Plaintiffs, the Class and the Court. Additionally, in the event that a settlement may have required Cendant to issue common stock and, perhaps, other securities, such as convertible debt, Lead Plaintiffs and Lead Counsel would need expert assistance to devise the characteristics of these "other" securities, and determine their settlement value to the Class.

115. Accordingly, Arthur Ainsberg, a highly regarded investment banking expert, assisted Lead Plaintiffs and Lead Counsel in the identification, investigation and selection of investment

39

banking firms.  Mr. Ainsberg also provided additional liaison guidance and assistance throughout the settlement process.

116.    Lead Counsel, with the assistance of Mr. Ainsberg, undertook an exhaustive search and bidding process.  Sixteen top-tier investment banking firms were identified and contacted, and six of those firms were interviewed.  The culmination of this process was the retention of Lazard to analyze the business and financial condition of Cendant, formulate appropriate strategies and structural alternatives in conjunction with settlement negotiations, and advise Lead Plaintiffs and Lead Counsel about the likely effects of potential settlement amounts, either in cash or in Cendant securities, on Cendant's present and future business and financial condition, as follows:

a.      Lazard obtained highly confidential business information from Cendant as if Lazard were performing due diligence in connection with a business combination.  That information included historical financial information (by business segment and line of business), and projected financial data (on both a consolidated and business segment basis) and all significant assumptions used therein, including operating budgets, long-term strategic and financial plans, capital expenditure budgets, debt maturity schedules, and schedules of the pro forma impact of proposed acquisitions and divestitures.

b.      Lazard met with senior Cendant financial personnel, including the Company's Chief Financial Officer, and with senior representatives of Merrill Lynch, Cendant's financial consultants, to discuss and review the materials provided by Cendant.

c.      Lazard thoroughly analyzed this information, together with significant information collected from other sources, to prepare a detailed five-year model of Cendant's financial condition and operations, including revenues, income and cash flows.

40

      d.     Lazard then developed extensive projections assuming a range of potential

settlement amounts and assuming different compositions of those potential settlements,

including settlements that would be all cash and others that would be part cash and part

Cendant common stock.

(*See* Affidavit of Albert H. Garner, sworn to May 3, 2000 ("Garner Aff.") at ¶¶5-6.)

     117.     Lead Counsel participated in Lazard's collection of information and development of

its models and projections, and, on May 27, 1999, Lead Plaintiffs and Lead Counsel were thoroughly

briefed by Lazard upon Lazard's completion of its tasks.  Lazard also presented its findings and

analyses to Cendant's counsel and Cendant's senior executives.  (*See* Garner Aff. at ¶7.)

     118.     Lead Plaintiffs, through Lead Counsel, obtained a thorough understanding of the

damages in the Action through the analyses prepared by Forensic Economics, which performed

extensive research concerning Cendant, CUC and HFS (the two companies that merged, effective

December 17, 1997, to form Cendant), including all public statements made by or about Cendant and

CUC during the Class Period, as well as the market's reaction to such statements, and to public

revelations about the Company's fraudulent scheme.  Based on this information, and on models of

securities trading, Forensic Economics performed complex damage analyses.  (*See* Dorkey Aff. at

¶2.)

     119.     Lead Counsel also obtained the damage analyses prepared by Cendant's damages

expert, National Economic Research Associates ("NERA"), in which NERA analyzed and critiqued

Forensic Economics' damages analyses.  Lead Counsel, together with Forensic Economics, reviewed

and analyzed NERA's criticisms of Forensic Economics' damages analyses.  Forensic Economics

greatly assisted Lead Counsel in our analysis of NERA's damage models.  (*See* Dorkey Aff. at ¶7.)

120.    The analyses prepared by Lazard and by Forensic Economics assisted significantly in settlement negotiations with Cendant and the HFS Individual Defendants, and were significant factors in Lead Plaintiffs' decision to agree to the Cendant Settlement. As a result, Lead Plaintiffs were fully informed about Cendant's financial capabilities and the extent of damages to the Class. Lead Counsel also reviewed pertinent insurance coverage information concerning E&Y and its partners. This information, once it was combined with Lead Plaintiffs' knowledge about the strength of the claims and defenses, thoroughly prepared Lead Plaintiffs for their settlement discussions.

## THE SETTLEMENT DISCUSSIONS

121.    Beginning in June of 1999, Lead Plaintiffs, through Lead Counsel, began settlement discussions with Cendant and the HFS Individual Defendants.

122.    Settlement discussions with Cendant and the HFS Individual Defendants were arduous and protracted. Over the course of the six months from June through December 1999, Lead Counsel and counsel for Cendant and the HFS Individual Defendants held many negotiating sessions, both in person and via telephone conference. At the same time, Lead Counsel vigorously pursued the Class's claims, both in Court and through the discovery process described above. Cendant and the HFS Individual Defendants strongly disputed the analysis and conclusions of Lead Plaintiffs' financial consultant and damages expert, particularly the amount of recoverable damages. Cendant supplied Lead Counsel with the analyses prepared by Cendant's own financial consultants and damages experts; Lead Plaintiffs and Lead Counsel, together with their experts, considered, analyzed and attempted to refute the conclusions of Cendant's experts. Cendant and the HFS Individual Defendants also argued that the investigation conducted by WF&G and AA did not

42

identify any of the HFS Individual Defendants as having participated in CUC's or CMS's fraud, and, in fact, that WF&G and AA had specifically identified only two of the CUC Individual Defendants – Corigliano and Pember – as well as several other non-party former employees (including third-party defendants Sabatino, Speaks, Sattler and Kearney) as actual participants in the fraud.

123.    Cendant also insisted that, in exchange for any settlement payment from the Cendant, Lead Plaintiffs dismiss all claims against the CUC Individual Defendants.  As a result, Cendant would not later be involved in cross- and counter-actions, or in actions for indemnification, commenced by any such individual from whom Lead Plaintiffs might obtained damages.  In addition, in this way Cendant would preserve its own claims against those individuals to the extent such claims otherwise would have been barred by the Private Securities Litigation Reform Act.

124.    Later during the summer of 1999, while settlement discussions were ongoing with Cendant and the HFS Individual Defendants, Lead Plaintiffs, again through Lead Counsel, began settlement discussions with E&Y.  These discussions, too, were arduous and contentious.  E&Y, as did Cendant and the HFS Individual Defendants, challenged Lead Plaintiffs' damages theory – indeed, E&Y maintained that its conduct did not cause *any* damage to the Class – as well as Lead Plaintiffs' assessment of E&Y's proportionate share of the Class's damages.  E&Y argued that it had conducted its audits of the annual financial statements of CUC and CMS according to generally accepted auditing standards, and that it had conducted its reviews of CUC's quarterly financial statements according to appropriate professional standards established by the American Institute of Certified Public Accountants.  E&Y adamantly denied all knowledge of, or participation in, CUC's and Cendant's fraudulent scheme; to the contrary, it was E&Y's position that Cendant and certain of its officers, directors, and employees had admitted to defrauding E&Y by, among other things,

43

making material false statements to E&Y and concealing material information from E&Y. E&Y argued that the WF&G and AA investigation confirmed the significant extent to which CUC and CMS employees went to conceal the fraud from E&Y.

125.   By the late fall of 1999, notwithstanding the contentious nature of settlement discussions with Cendant, the HFS Individual Defendants and E&Y, Lead Plaintiffs were ready to reach separate tentative settlement agreements with (a) Cendant and the HFS Individual Defendants, and (b) E&Y. Lead Plaintiffs, Cendant, the HFS Individual Defendants and E&Y presented the relevant terms of the separate Settlements to the Court, after which they were publicly announced on December 7, 1999 (Cendant and the HFS Individual Defendants) and December 17, 1999 (E&Y).

126.   Even after Lead Plaintiffs reached agreements in principle with Cendant and the HFS Individual Defendants, and with E&Y, there were still significant negotiations and drafting efforts that were required before the parties could agree to, and submit for preliminary approval, the Stipulations of Settlement. These efforts included: drafting the Stipulations; drafting the Notice and Summary Notice in a form acceptable to all parties, and to the Court; devising and describing a Plan of Allocation that is fair and reasonable to all Class Members, which involved a great deal of interaction with our damages expert; providing for the Letter of Credit and Surety Bond, in a form acceptable to Lead Plaintiffs and Cendant's guarantors, that will ensure the safety of the Cendant Settlement Amount; drafting mutually acceptable provisions in the two Stipulations, and forms of Judgment, that maintain to the maximum extent allowed by law the claims of Cendant and the HFS Individual Defendants against E&Y, and vice versa; working with the Claims Administrator in connection with the Notice, Summary Notice, Plan of Allocation and claim administration; and

responding to numerous inquiries from Class Members, among others, concerning the Settlements and the anticipated distribution of the Settlement Funds.

127.    On March 29, 2000, after months of negotiating the precise terms of the two separate Settlements, Lead Plaintiffs, on the one hand, and Cendant and the HFS Individual Defendants, on the other, executed the Cendant Settlement Stipulation, and Lead Plaintiffs and E&Y executed the E&Y Settlement Stipulation.

128.    Pursuant to the Hearing Order dated March 29, 2000 (the "Hearing Order"), Lead Plaintiffs undertook the following actions:

a.    Beginning on April 7, 2000, Lead Plaintiffs, through HR&S, mailed the Court-approved Notice of Settlement of Class Action (the "Settlement Notice") to over 440,000 persons and entities:

i.    as identified on the transfer records and other computer records supplied by Cendant for purchasers of Cendant and CUC publicly traded securities (other than PRIDES) during the Class Period;

ii.    based on written or telephone requests received by HR&S in connection with mailing the Notice of Pendency;

iii.    who were identified as potential Class Members by banks, brokers or other nominee holders in connection with mailing the Notice of Pendency;

iv.    banks, brokers, institutional investors and other nominee holders, as described on lists generally maintained by HR&S for such purposes.

45

b.      On April 17, 2000, Lead Plaintiffs, through HR&S, published the Court-approved Summary Notice of Settlement of Class Action (the "Summary Settlement Notice") in the national edition of *The Wall Street Journal*.

c.      On April 18, 2000, Lead Plaintiffs, through HR&S, published the Summary Settlement Notice in *The New York Times*.

d.      On April 19, 2000, Lead Plaintiffs, through HR&S, published the Summary Settlement Notice on the *PR Newswire*.

129.    Further, HR&S has maintained a toll free, or "800," telephone number, as identified in paragraph 22 of the Settlement Notice, to field calls from Class Members.  In addition, both HR&S and Lead Counsel have posted the Settlement Notice and Proof of Claim form on their respective websites for direct access by potential Class Members.

130.    Under the terms of the Settlement Notice, Class Members have until May 31, 2000 for Lead Counsel to receive submissions in support or in opposition to the Settlement, the Plan of Allocation, the application for an award of attorneys' fees, and the application for reimbursement of expenses.  As of today, no objections have been received.

## THE BENEFITS OF THE SETTLEMENTS

131.    This is the largest securities class action settlement in United States history.  The Cendant Settlement is more than three times the highest recovery ever previously obtained in a securities class action, and approximately ten times the recovery in the next largest securities class action involving fraudulent financial statements. In addition, the Cendant Settlement provides for an additional 50% interest in any net recovery that Cendant or the HFS Individual Defendants may

46

obtain from E&Y in resolution of claims they have or are litigating against E&Y, and important corporate governance improvements that could only have been achieved through settlement of the Action. The E&Y Settlement is the largest amount ever paid by an accounting firm in a securities class action. Notwithstanding the sheer magnitude of the Settlements, Lead Plaintiffs considered a variety of factors in negotiating and deciding to accept the Settlements, and to recommend that the Court approve them. The benefits of the Settlements include the following:

    a.    Together, the Cendant and E&Y Settlement payments of $3,186,500,000 represent over 37% of the $8.5 billion in recoverable damages, as estimated by Lead Plaintiffs' expert. Cendant's damages expert estimated reasonable compensable damages at a fraction of the $8.5 billion amount determined by Lead Plaintiffs' damages expert. The combined settlement payments would represent well over 60% of Cendant's estimated damages.

    b.    Based on Lead Counsel's experience in prosecuting securities class actions, and on Lead Counsel's survey of experienced claims administrators, it is reasonable to assume that 25-30% of potential claimants will not file claims for a distribution from the Settlement Fund. In such a case, the combined Settlement payments would represent between 50% and 54% of Lead Plaintiffs' estimation of reasonable compensable damages, and 80% of Cendant's estimation.

    c.    The Settlements are all cash. No common stock or any other security will be issued to settle this Action. This represents an unprecedented amount of cash paid to settle a securities class action, and avoids the market fluctuation risks and valuation issues attendant to settlements that include the issuance of securities by a defendant.

d.      The entire amount of the combined Cendant and E&Y payments will earn interest for the benefit of the Class guaranteed starting on August 20, 2000 (on the Cendant Settlement Amount) and on April 15, 2000 (on the E&Y Settlement Amount), well before payments are made to Class Members.  With settlement amounts of this magnitude, the interest earned will be over $12 million each month.

e.      The entire Cendant Settlement Amount, which is not due to be paid into the Escrow Account until 120 days after the Judgment approving the Cendant Settlement is final, will be guaranteed by a letter of credit or surety bond, in form, and from financial institutions, approved by Lead Plaintiffs.

f.      The 50% interest that the Class has in any net recovery Cendant or the HFS Individual Defendants may receive from E&Y in resolution of claims they have or are litigating against E&Y could result in a further significant recovery for the Class.

g.      The corporate governance improvements agreed to by Cendant are far-reaching and unprecedented in securities class action litigation; indeed, Lead Counsel are unaware of any more extensive corporate governance improvements agreed to even in settlement of a derivative action.  These improvements – which could only have been achieved through an amiable resolution of the Action – effected important changes to Cendant's corporate functioning.  The corporate governance improvements were obtained from Cendant without sacrificing any amount of monetary recovery.  These improvements also were quite important to the Company.  On April 5, 2000, Cendant announced that its Board would be restructured effective May 25, 2000, more than two years before it was

48

required to do so, to be in compliance with the Board composition provisions of the Cendant Settlement. (*See* Cendant Press Release, attached as Exhibit A hereto.)

h.     By accepting the Settlements, Class Members get substantial cash payments now. With discovery in its early stages, if Lead Plaintiffs were to press toward a trial, it would be at least one to two years before a trial could begin. And if Lead Plaintiffs were successful at trial, Defendants certainly would appeal. Thus, without a settlement, it would be several years before Class Members received any recovery.

i.     Although E&Y is a vital "Big 5" public accounting firm, collecting any more than $335 million would have been unlikely, and may have required pursuing separate claims throughout the U.S. against individual E&Y partners. For similar reasons, Lead Plaintiffs and Lead Counsel believe that collecting more than $2.85 billion from Cendant, the HFS Individual Defendants and the other Individual Defendants would have been unlikely. If Lead Plaintiffs were successful at trial, it is highly likely that any Defendant found by the jury to be culpable would not have the financial wherewithal either to satisfy the judgment or to post the necessary bond for an appeal. As a result, those Defendants would likely seek bankruptcy protection. It would then take years to resolve the Action via the bankruptcy courts, which also likely would result in accepting significantly less than any amount awarded by a jury, and no more than the amounts being paid now pursuant to the Settlements.

49

j.      Accepting the Settlements will avoid the substantial risks involved in succeeding at trial against all Defendants and collecting from them:

i.      Notwithstanding the precision of the $8.5 billion in damages calculated by Lead Plaintiffs' damages expert, a jury could agree with Cendant's damages expert that reasonable compensable damages are just a fraction of that amount.

ii.     Even with compensable damages at approximately $8.5 billion, it is possible that, notwithstanding the admissions of certain of the Defendants, a jury may not have awarded such a tremendous amount of damages.

iii.    Even if total damages may ultimately be awarded, a jury still could have determined that the persons most culpable for these false financial statements were defendants Corigliano and Pember, or third-party defendants Sabatino, Speaks, Sattler and Kearney. Under the PSLRA's proportionate liability requirements, which provide that a defendant may be obligated to pay *only* for the portion of damages for which that defendant is held responsible, a jury may have placed a high proportion of liability on certain of the Individual Defendants, who would not have been able to shoulder a substantial amount of damages, and a correspondingly small proportion of liability on Cendant and E&Y. As a result, the amounts uncollectible from those Individual Defendants would not be paid by any other defendant that may have been found less culpable.

iv.     Moreover, eighteen of the 28 Individual Defendants were non-employee or "outside," directors of Cendant, CUC or HFS. Those outside directors

50

have available to them a due diligence defense that permits them to avoid liability if they reasonably relied on experts. Here, each of the outside directors would claim justifiable reliance on E&Y, which performed the audits of CUC's financial statements, and which issued unqualified auditors' reports on those financial statements. While Lead Plaintiffs and E&Y would vigorously dispute this defense, it nevertheless could prove a difficult hurdle to overcome at trial.

  v.  The five HFS Individual Defendants who were not outside directors – Silverman, Snodgrass, Monaco, Buckman and Scott Forbes – were not responsible for CUC's financial statements prior to December 17, 1997, the effective date of the Merger, and, therefore, could not be liable for damages that resulted from the materially false financial statements issued prior to that date. This pre-merger period comprises over 75% of the Class Period. Further, the HFS Individual Defendants have claimed reliance on E&Y for the issuance of the CMS 1997 financial statements, and have claimed reliance on Cendant's own outside auditors for the accuracy of the April 15, 1998 press release and the first and second quarter 1998 financial statements at issue in the action. While Lead Plaintiffs and E&Y would vigorously dispute this defense, it nevertheless could prove a difficult hurdle to overcome at trial.

  vi.  Of the five CUC Individual Defendants that were not outside directors, only two – Corigliano and Pember – together with third-party defendants Sabatino, Speaks, Sattler and Kearney, as well as other more junior CUC or CMS employees, were identified by WF&G and AA as having actively participated in the

51

fraud. Thus, the senior executives with a greater ability to withstand some financial burden (*viz.*, Walter Forbes, Shelton and McLeod) would have the better of the defenses at trial.

vii.     Further, with only lower level employees identified by WF&G and AA as perpetrating the fraud, it might be difficult to attribute to Cendant a large portion of the liability, and a jury may find that the fraudulent activity was not Cendant's or CUC's responsibility.

viii.    Lead Plaintiffs alleged securities law violations against E&Y based on E&Y's alleged recklessness in conducting its audits and reviews of CUC's and CMS's annual and quarterly financial statements. The WF&G and AA investigation found that CUC and CMS employees went to great lengths to conceal the fraud from E&Y by, among other things, hiding documents from E&Y, making false representations to E&Y and providing E&Y with false financial analyses. This provides E&Y with a meaningful defense to Lead Plaintiffs' allegation that E&Y recklessly failed to uncover CUC's and CMS's fraud.

132.    Further, Lead Plaintiffs – the three largest public pension funds in the United States -- were instrumental in negotiating the two settlements; Lead Plaintiffs strongly endorse these two settlements and recommend that they be approved. Lead Plaintiffs decided to accept the Settlements only after consultation with Lead Counsel and the experts retained to assist them, and after extensive investigation of the documents and responses to interrogatories provided to Lead Plaintiffs in discovery. Consequently, Lead Plaintiffs and Lead Counsel have determined that the Settlements are in the best interests of Class Members.

## THE PLAN OF ALLOCATION

133.    Class Members who suffered a loss as a result of their purchases of Cendant or CUC publicly traded securities during the Class Period and who (a) establish membership in the Class, and (b) complete and send a valid claim form and all required documentation to HR&S on or before August 18, 2000, will receive a distribution from the Net Settlement Fund.  Such distribution shall be in accordance with the Plan of Allocation attached to the Notice of Settlement sent to individual Class Members.

134.    The Plan of Allocation provides that a "Loss Amount" will be calculated for each purchase or acquisition of Cendant or CUC publicly-traded securities that is listed in the claim form, and for which adequate documentation is provided.  These Loss Amounts will be based on the level of artificial inflation in the prices of each CUC and Cendant publicly-traded security, as determined by plaintiffs' damages expert, Forensic Economics.

135.    Under the Plan of Allocation, Loss Amounts will be reduced dollar-for-dollar to the extent that (a) shares of CUC or Cendant common stock were purchased or acquired at a price below the lowest trading price for CUC or Cendant common stock reported by the New York Stock Exchange on the date during the Class Period on which the purchase or acquisition was made (*e.g.*, in a private sale or at a discounted price), or (b) shares of CUC or Cendant common stock were sold at a price above the highest trading price for CUC or Cendant common stock reported by the New York Stock Exchange on the date during the Class Period on which the sale was made.

53

**LOSS AMOUNT METHODOLOGY FOR CUC AND**
**CENDANT COMMON STOCK AND PUBLICLY-TRADED NOTES**

136.     Lead Plaintiffs' damages expert, Forensic Economics, calculated the reasonable
percentage of artificial inflation in the daily closing market prices for Cendant or CUC common
stock and for publicly-traded notes for each day in the Class Period, that, in its opinion, was
attributable to the alleged wrongdoing. Forensic Economics analyzed the market price reaction to
public disclosures that revealed or described the alleged misrepresentations or their effects. It
measured the percentage price decline associated with each particular disclosure, adjusted that price
reaction to eliminate the effects, if any, attributable to general market or industry conditions, and
then used standard statistical techniques to ensure that the price reaction was statistically significant
(*i.e.*, greater than the normal variation in the security price). Forensic Economics, thus, isolated the
price effect that it reasonably believed was caused by the fraud. (*See* Dorkey Aff. at ¶¶11-30.)

137.     By accumulating the total isolated market reaction attributable to each public
disclosure of the fraud, Forensic Economics determined, in its expert opinion, the reasonable amount
of total artificial inflation in the market price of CUC or Cendant common stock and in the price of
publicly-traded notes, expressed as a percentage of each publicly-traded security's closing market
price as of April 15, 1998, the date of the first public disclosure of the fraud. (*See* Dorkey Aff. at
¶30.)

138.     There were twelve materially false and misleading quarterly earnings disclosures
made during the period from May 31, 1995, the first day of the Class Period, through April 15, 1998.
Accordingly, Forensic Economics had to allocate the total artificial inflation as of April 15, 1998
back to each quarterly period before April 15, 1998. The total artificial inflation was allocated to

54

those quarters in direct proportion to the relationship that each such period's earnings overstatement bore to the total amount of earnings overstatement in CUC's and Cendant's SEC filings and other public earnings releases. (*See* Dorkey Aff. at ¶34.)

139.    The Company overstated each quarter's earnings throughout the entire period from May 31, 1995 through April 15, 1998; accordingly, the cumulative amount of earnings overstatement grew for each succeeding quarter within that period, which caused the estimated percentage of artificial inflation included in the closing market price to increase proportionately with each quarterly earnings announcement. Forensic Economics applied the same percentage of artificial inflation to each day within each quarterly period prior to April 15, 1998. (*See* Dorkey Aff. at ¶34.)

140.    Forensic Economics then determined the reasonable amount of total artificial inflation for the periods from April 16, 1998 (the first day after Cendant's initial partial disclosure) through July 14, 1998 (the date of Cendant's next partial disclosure), and from July 15, 1998 through August 28, 1998 (the last day of the Class Period), as follows:

a.    For the period from April 16, 1998 through July 14, 1998, Forensic Economics reduced the total amount of artificial inflation as of April 15, 1998 (expressed as a percentage of closing market price) by the amount of inflation that Forensic Economics determined, in its expert opinion, was reasonably attributable to the partial disclosure made by Cendant on April 15, 1998.

b.    For the period from July 15, 1998 through August 28, 1998, Forensic Economics reduced the total amount of artificial inflation as of July 14, 1998 (also expressed as a percentage of closing market price) by the amount of inflation that Forensic Economics

55

determined, in its expert opinion, was reasonably attributable to the partial disclosure made by Cendant on July 14, 1998.

This methodology eliminates from the total artificial inflation for each of these two post-April 15, 1998 periods the amount of inflation attributable to the two earlier public announcements of the fraud; in this way, the total artificial inflation for the period from April 16, 1998 through July 14, 1998 is unaffected by the artificial inflation caused by the April 15, 1998 partial disclosure, and the artificial inflation for the period from July 15, 1998 through August 28, 1998 is unaffected by the artificial inflation caused by both the April 15, 1998 and July 14, 1998 partial disclosures. The percentage of artificial inflation in the closing market price calculated for the two post-April 15, 1998 periods was then applied to the closing market prices for each day within those periods. (*See* Dorkey Aff. at ¶33.)

141.    The Plan of Allocation further recognizes the existence of the claims under Section 11 of the Securities Act of 1933 possessed by those persons who acquired Cendant common stock in exchange for shares of HFS common stock in connection with the CUC/HFS merger. For these Class Members, the Plan of Allocation provides that Loss Amounts for shares acquired in the Merger are the *greater* of those described above in paragraphs 136-39, or as calculated under the statutory method for calculating damages set forth in Section 11 of the Securities Act of 1933. (*See* Dorkey Aff. at ¶¶43-44.)

**LOSS AMOUNTS FOR PURCHASES OF**
**CALL OPTIONS ON CENDANT COMMON STOCK**

142.    The Loss Amount for each call option purchased on Cendant common stock was computed using the Black-Scholes option valuation formula. That formula considers such factors

as an option's strike price, the market price volatility of the associated common stock, market interest rates, and the time until an option's expiration. In this case, the formula was applied to the market price of Cendant common stock both with and without artificial inflation caused by the alleged wrongdoing. The Black-Scholes formula is the recognized standard for valuing stock options. (*See* Dorkey Aff. at ¶¶45-48.)

**LOSS AMOUNTS FOR PUBLICLY TRADED SECURITIES PURCHASED AND SOLD DURING THE PERIOD BETWEEN MAY 31, 1995 AND APRIL 15, 1998**

143. The Plan of Allocation provides that, for each publicly-traded CUC or Cendant security that was either purchased or acquired during the period from May 31, 1995 through April 15, 1998, and also sold during that same period, the Loss Amount is $0. This determination was made (a) because both the purchase or acquisition, on the one hand, and the sale, on the other, occurred before any adverse information about CUC's and Cendant's fraudulent scheme was publicly disclosed; and (b) because the percentage of artificial inflation in the closing market price, as determined by Forensic Economics, increased throughout the period from May 31, 1995 through April 15, 1998. (*See* Dorkey Aff. at ¶¶31, 34.)

**COMPOSITION OF THE NET SETTLEMENT FUND**

144. The Net Settlement Fund will be divided into two parts: The amount paid by Cendant (the "Cendant Settlement Fund") and the amount paid by E&Y (the "E&Y Settlement Fund").

a. In connection with E&Y's motion to dismiss the Complaint, this Court found, as a matter of law, that, because E&Y made no public statements after April 15, 1998, and because the public was warned by Cendant on April 15, 1998 that E&Y's previously issued

auditors' reports on CUC's and CMS's financial statements could no longer be relied upon, E&Y has, and can have, no liability for purchases of Cendant publicly-traded securities made after April 15, 1998.

      b.      Lead Plaintiffs and Lead Counsel have determined that it would be extremely difficult to prevail on appeal on claims against E&Y made on behalf of those Class Members who purchased Cendant securities after April 15, 1998. This is because it is unlikely that Lead Plaintiffs would be able to show E&Y's liability after April 15, 1998 in the absence of any public statement by E&Y after that date, and in view of Cendant's public warning on April 15, 1998 that E&Y's previously issued auditors' reports could no longer be relied upon.

      c.      Therefore, the Net Settlement Fund will be allocated as follows:

      i.      The E&Y Settlement Fund will be allocated only to settle the claims of Class Members who have incurred a Loss Amount as a result of the purchase or acquisition of CUC or Cendant publicly-traded securities made during the period from May 31, 1995 through April 15, 1998.

      ii.      The Cendant Settlement Fund will be allocated to settle the claims of Class Members who have incurred a Loss Amount as a result of the purchase or acquisition of CUC or Cendant publicly-traded securities made between and including May 31, 1995 and August 28, 1998.

      iii.      In the event that the sum total of Loss Amounts of *all* Authorized Claimants who are entitled to receive payment out of the Cendant Settlement Fund is greater than or equal to the Cendant Settlement Fund, each such Authorized

Claimant shall receive a *pro rata* share of the Cendant Settlement Fund, which shall be the Authorized Claimant's Loss Amount divided by the total of all Loss Amounts to be paid from the Cendant Settlement Fund, multiplied by the total amount of the Cendant Settlement Fund.

iv.     If the Cendant Settlement Fund exceeds the sum total amount of the Loss Amounts of all Authorized Claimants entitled to receive payment out of the Cendant Settlement Fund, the excess amount in the Cendant Settlement Fund shall be distributed *pro rata* to all Authorized Claimants.

v.     In the event that the sum total of Loss Amounts of *all* Authorized Claimants who are entitled to receive payment out of the E&Y Settlement Fund is greater than or equal to the E&Y Settlement Fund, each such Authorized Claimant shall receive a *pro rata* share of the E&Y Settlement Fund, which shall be the Authorized Claimant's Loss Amount divided by the total of all Loss Amounts to be paid from the E&Y Settlement Fund, multiplied by the total amount in the E&Y Settlement Fund.

vi.     If the E&Y Settlement Fund exceeds the sum total amount of the Loss Amounts of all Authorized Claimants entitled to receive payment out of the E&Y Settlement Fund, the excess amount in the E&Y Settlement Fund shall be distributed *pro rata* to all such Authorized Claimants.

59

**MULTIPLE TRANSACTIONS**

145.    Finally, the Plan of Allocation provides that, for Class Members who made multiple purchases, acquisitions or sales during the Class Period, the earliest subsequent sale shall be matched with the earliest purchase and chronologically thereafter for purposes of the Claim calculations.

146.    The Plan of Allocation also provides that all profits shall be subtracted from all losses on all transactions of CUC and Cendant publicly-traded securities during the class period in order to determine the net claim of each Class Member. If a Class Member made a net profit, the value of his, her or its claim shall be zero.

147.    Lead Plaintiffs and Lead Counsel carefully considered the Plan of Allocation. After consulting with Forensic Economics (and with HR&S on the manageability of the Plan), Lead Plaintiffs and Lead Counsel strongly endorse the Plan, and recommend that it be approved as fair and reasonable to all Class Members.

## ATTORNEYS' FEES AND EXPENSES

148.    Lead Counsel are petitioning for an award of attorneys' fees in strict compliance with the fee parameters in the grid that was approved by the Court in advance as the lowest qualified bid proposal, as set forth above in paragraph 50. Lead Counsel are seeking attorneys' fees under the second column of the fee grid, because the Cendant Settlement and the E&Y Settlement both were reached during discovery, after adjudication of motions to dismiss, but prior to the adjudication of motions for summary judgment. Applying those grid percentages after deducting from the total of the Cendant Settlement Amount and the E&Y Settlement Amount the expenses accrued in prosecuting the Action, the requested fee is 8.275% of that net amount. Lead Counsel also seek

interest on the fee amount awarded, as earned by the Cendant Settlement Amount and the E&Y Settlement Amount.

149.     Through March 31, 2000, Lead Counsel and firms that performed work at the specific request of Lead Counsel have incurred $8 million in "lodestar" in the prosecution and resolution of this Action.  In addition, other counsel in the case have reported to Lead Counsel that they have incurred compensable lodestar and expenses in the Action.  In this Court's September 8, 1998 Opinion, the Court stated: "Payment of the fees and costs of any lawyers or firms assisting the lead counsel, if any, will be the responsibility of the lead counsel." (*See* 182 F.R.D. at 151.)  Pursuant to the Court's directive, Lead Counsel will determine the appropriateness of payment to other plaintiffs' counsel, which shall be made out of the amount awarded to Lead Counsel as attorneys' fees and, thus, will not be charged to the Class.  Lead Counsel will continue to expend a substantial amount of time in preparation for the Final Settlement Hearing on June 28, 2000, and thereafter in connection with administration of the Settlements.

150.     Lead Counsel are not seeking to place a value on the extensive corporate governance changes obtained from Cendant, nor will Lead Counsel apply for an attorneys' fee as a result of such corporate governance changes, although we have been advised that such changes translate into considerable value for Cendant's shareholders.

151.     Lead Counsel also are seeking the reimbursement of expenses they incurred prosecuting the Action, together with interest earned. These expenses total $14,623,806, and are as follows:

Experts (as described herein):
    Lazard Frères & Co. LLC          $ 13,208,151
    Forensic Economics, Inc.              271,560

| | | |
|---|---|---|
| Marks Paneth & Shron LLP | 349,881 | |
| Arthur S. Ainsberg | 250,000 | |
| Other | 15,402 | $ 14,094,994 |

| | |
|---|---|
| Investigations | 50,107 |
| Document Retrieval | 15,589 |
| Court, Service and Transcript Fees | 4,734 |
| Photocopying | 264,576 |
| Electronic Research | 96,462 |
| Messenger & Courier | 7,484 |
| Postage and Telephone | 38,597 |
| Transportation/Travel/Meals | 43,263 |
| Prepaid Notice Costs | 8,000 |
| Total | $ 14,623,806 |

152.    The fee for Lazard's services was negotiated by Lead Plaintiffs after an exhaustive search and bidding process in which Lead Counsel, with the assistance of Arthur Ainsberg, identified and contacted sixteen top-tier investment banking firms and interviewed six of those firms, prior to the retention of Lazard.  Lazard's fee was calculated in accordance with the retainer agreement between Lead Plaintiffs and Lazard.  (*See* Garner Aff. at ¶3, and Exhibit 1 thereto.)

153.    The fee for Forensic Economics' services is based on hourly charges negotiated by Lead Plaintiffs in advance after the consideration of other damages experts.  (*See* Dorkey Aff. at ¶6, and Exhibit B thereto.)

154.    The fee for MP&S's services is based on MP&S's regular hourly charges, plus out-of-pocket expenses.  (*See* Invoice from MP&S, attached as Exhibit B hereto.)  The fee for Arthur S. Ainsberg is $250,000.  (*See* Invoice from Arthur S. Ainsberg, attached as Exhibit C hereto.)

62

## CONCLUSION

155.    The $3,186,500,000 in cash payments provided by the Settlements is an excellent result, especially when combined with the 50% interest in any net recovery Cendant or the HFS Individual Defendants may receive from E&Y.   The corporate governance improvements are unprecedented, and would not have been available to the Class even if Lead Plaintiffs were completely successful at trial.  The Settlements were achieved, and are being recommended to the Class and to the Court by Lead Plaintiffs, the NYSCRF, CalPERS and the NYCPF, the largest public pension systems in the U.S.  The Settlements, which were negotiated by skilled counsel for all parties, provide an extraordinary recovery for the Class.  If this Action were to continue to trial, the attendant risks would be considerable.  Accordingly, Lead Plaintiffs and Lead Counsel respectfully request that this Court approve the Settlements and the Plan of Allocation as fair, reasonable and adequate.

156.    Lead Counsel further respectfully submit that the fee being requested is fair and reasonable to the Class, and, therefore, request that this Court grant in its entirety the Petition of Lead Counsel for an Award of Attorneys' Fees and Reimbursement of Expenses.

We declare, under penalty of perjury, that the foregoing is true and correct.

_____          _____
Max W. Berger                    Leonard Barrack