COHN LIFLAND PEARLMAN
 HERRMANN AND KNOPF, LLP
Peter S. Pearlman (PP8416)
Park 80 Plaza West One
Saddle Brook, NJ 07663
(201) 845-9600

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

### "Document Electronically Filed"

```
-------------------------------------------------- x
                                                   :
In re CENDANT CORPORATION                          :          Master File No. 98-1664
LITIGATION                                         :
                                                   :          Hon. William H. Walls, U.S.D.J.
-------------------------------------------------- x
                                                   :
This document relates to Reliant Trading,          :
et al. v. Cendant Corporation et al.,              :
Case No. 99-C-0381 (E.D. Wisc.)                    :
                                                   :
-------------------------------------------------- x
```

## PLAINTIFFS RELIANT TRADING AND SHEPHERD TRADING LIMITED'S COMBINED MEMORANDUM OF LAW IN OPPOSITION TO CENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON THEIR CONTRACT CLAIM

## TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................... i

TABLE OF AUTHORITIES............................................................................. iii

INTRODUCTION AND SUMMARY OF ARGUMENT.......................................1

RESPONSE TO CENDANT'S COUNTER-STATEMENT
OF MATERIAL FACTS....................................................................................4

ARGUMENT....................................................................................................6

I.    CENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS
      MUST BE DENIED BECAUSE THE NO-ACTION CLAUSE IN THE
      INDENTURE DOES NOT BAR THE RELIANT PLAINTIFFS'
      BREACH OF CONTRACT CLAIM.........................................................6

      A.    The Reliant Plaintiffs Have An Absolute Right To Sue
            For Principal And Interest..........................................................6

      B.    The Reliant Plaintiffs, As *Former* Holders Of The Bonds,
            Were Exempted From Compliance With The No-Action
            Clause........................................................................................9

      C.    The Reliant Plaintiffs are Excused from Compliance with
            the No-Action Clause Because The Trustee Has Been
            Discharged...............................................................................11

II.   THE RELIANT PLAINTIFFS' MOTION FOR SUMMARY
      JUDGMENT SHOULD BE GRANTED...................................................13

      A.    Knowledge Of The Fraud By Cendant Officers At The Time
            Of The Notice Of Redemption Must Be Imputed To The
            Corporation..............................................................................14

            1.    The "adverse agent" exception to imputation is not
                  applicable to a breach of contract claim..................................15

            2.    The "adverse agent" exception to imputation is not
                  available where the principal has knowingly retained
                  a benefit..........................................................................17

      B.    Offsetting Gains On *Separate* Transactions Is Inappropriate
            In Considering Damages For Breach Of Contract.......................19

1.      **The Reliant Plaintiffs are entitled to the benefit of their bargain**..................................................................20

2.      **The Reliant Plaintiffs' contract damages are not subject to offsets for profits on separate transactions**............................24

3.      **Damages and Prejudgment Interest**......................................29

**CONCLUSION**.......................................................................... 32

## **TABLE OF AUTHORITIES**

**Cases**

*Abrahamson v. Fleschner*, 568 F.2df 862 (2d Cir. 1977)...................................................28

*Acacia Nat'l Life Ins. Co. v. Kay Jewelers, Inc.*, 203 A.D. 40, 42-43,
    610 N.Y.S.2d 209, 212 (1ˢᵗ Dept. 1994)......................................................... 10

*Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972)...........................................28

*Alesayi Beverage Corp. v. Canada Dry Corp.*, 947 F.Supp. 658, 671 (S.D.N.Y. 1996)......21, 26

*Bank of New York v. Battery Park City Authority*, 251 A.D.2d 211,
    675 N.Y.S.2d 860, 860-861 (1ˢᵗ Dept. 1998).......................................................10

*Batchelder v. Council Grove Water Co.*, 131 N.Y. 42, 29 N.E. 801 (1892)..........................9

*Baumel v. Rosen,* 412 F.2d 571, 575 (4th Cir.1969)..........................................28, n. 15

*Birn v. Childs Co.*, 37 N.Y.S.2d 689, 696 (1942).......................................................9

*Broad v. Rockwell Int'l. Corp.*, 642 F.2d 929, 957-58 (5ᵗʰ Cir. 1981)..........................14, n.9

*Byrnes v. Faulkner, Dawkins & Sullivan*, 550 F.2d 1303 (2d Cir. 1977)............................28

*Campbell v. Hudson & Manhattan R. Co.*, 277 A.D. 731, 734,
    102 N.Y.S.2d 878, 881 (1ˢᵗ Dept. 1951).......................................................12

*Center v. Hampton Affiliates, Inc.,* 497 N.Y.S.2d 898, 899 (Ct.App. 1985).........................14

*Chem. Bank v. Stahl*, 712 N.Y.S.2d 452, 462 (App.Div. 2000).....................................13

*Continental Casualty Co. v. State of New York Mortgage Agency,*
    1998 WL 513054 (S.D.N.Y.)..........................................................8, 11, n. 7

*Cruden v. Bank of New York*, 957 F.2d 961, 967-69 (2d Cir. 1992)..........................6, 7 n. 5

*Dalton v. Educational Testing Service,* 87 N.Y.S.2d 384, 389,
    663 N.E.2d 289, 291, 639 N.Y.S.2d 977, 979 (1995)......................................14

*Donald Rubin, Inc. v. Schwartz*, 191 A.D.2d 171, 594 N.Y.S.2d 193 (1ˢᵗ Dept. 1993)...........25

*Envirodyne Industries, Inc. v. Connecticut Mutual Life Ins. Co*, 174 B.R. 986
    (N.D. Ill. 1994)........................................................................8

*Feldbaum v. McRory*, 1992 WL 119095 (Del.Ch.).............................................9-10, 12

*Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 382,
    357 N.Y.S.2d 857, 860 (1974)..................................................................21

*Green v. Occidental Petroleum Corp.,* 541 F.2d 1335, 1342 (9th Cir. 1976)..............28, n. 15

*Greene v. Cuykendall,* 40 N.Y.S.2d 801 (Supr.1943).................................................16

*In re Cendant Corporation Securities Litigation (Yeager et al. v.*
    *Cendant Corporation et al.),* 109 F.Supp. 225 (D.N.J. 2000)................................15

*Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490 (2d Cir. 1995).....................................26

*JAS Securities LLP v. Merrill Lynch & Co.,* 2000 WL 303313, *3 (Del. Super.)...............8, n.6

*Keywell Corporation v. Piper & Marbury, LLP*, 1997 WL 627636, *5 (W.D.N.Y.)...............25

*LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1371 (Fed.Cir. 2003).........26-27

*Levine v. Seilon, Inc.,* 439 F.2d 328, 334 (2d Cir.1971)......................................28, n. 15

*Macon-Bibb et al. v. Tuttle/White Constructors, Inc.,*
    530 F.Supp 1048, 1055 (M.D.Ga. 1981)......................................................25

*Marine Midland Bank v. John E. Russo Produce Co., Inc.*, 50 NY.2d 31, 44 (1980).............17

*Minpeco v. Conticommodity Services, Inc.*, 676 F.supp. 486 (S.D.N.Y. 1987)................27-28

*Minpeco v. Conticommodity Services, Inc.*, 718 F.Supp. 168, 170 (S.D.N.Y. 1989)...............28

*National Credit Union Admin. v. Ticor Title Ins. Co.,*
    873 F.Supp. 718, 727 (D.Mass. 1995)........................................................17

*Pidcock v. Sunnyland America, Inc.,* 854 F.2d 443 (C.A.11 1988).........................28, n. 15

*Randall v. Loftsgaarden*, 478 U.S. 647, 662-63 (1985)...........................................28-29

*Resolution Trust Corporation v. Fleischer*, 880 F.Supp 1446, 1451 (D.Kan. 1995)...............25

*Rochez Bros., Inc. v. Rhoades*, 491 F.2d 402, 416-17 (3d Cir. 1973).......................28, n. 15

*Rossdeutscher v. Viacom*, 768 A.2d 8 (Del. 2001) ...............................................9-11

*SEC v. MacDonald,* 699 F.2d 47, 53 (1st Cir.1983)........................................28, n. 15

*Siebel v. Scott,* 725 F.2d 995, 1001 (5th Cir.)..................................................28, n. 15

*Sunrise Properties, Inc. v. Bacon, Wilson, et al.,* 679 N.E.2d 540, 543 (Mass. 1997).............16

*Texas Co. v. Miller,* 165 F.2d 111, 114-15 (5th Cir.1947)....................................28, n. 15

*Tomei v. Globalstar Capital Corp.,* 2001 WL 1729853 (Del.Super.)............................8, n. 6

*Townsend v. Milaca Motor Co.,* 260 N.W. 525, 527 (Minn. 1935)...................................12

*UPIC & Co. v. Kinder-Care Learning Centers, Inc.,* 793 F.Supp. 448, 450-55
    (S.D.N.Y.1992)...........................................................................................8

## Statutes and Rules

15 U.S.C. § 77ppp(b) ...............................................................................6

N.Y.C.P.L.R. § 5001 ...............................................................................10

N.Y.C.P.L.R. § 5004 ...............................................................................31

## Other Authorities

3 N.Y.JUR.2d *Agency and Independent Contractors,* § 249...........................................16

3 N.Y.JUR.2d *Agency and Independent Contractors*, § 268...........................................16

Restatement (Second) of Agency, §282 .....................................................15-16, 17

Restatement (Second) of Contracts, § 344 ......................................................20

Restatement (Second) of Contracts, § 347..................................................24, 25

Restatement (Third) of Agency, § 5.04(a) (Tentative Draft No. 6, 2005).......................16, 17

Plaintiffs Reliant Trading and Shepherd Trading Limited (collectively, the "Reliant Plaintiffs") submit this combined Memorandum of Law in opposition to Defendant Cendant Corporation's ("Cendant") cross-motion for judgment on the pleadings and Reply Brief in support of their motion for summary judgment on their breach of contract claim.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Reliant Plaintiffs were holders of Cendant's 4 ¾% convertible bonds maturing in 2003 (the "Bonds") when Cendant gave notice of its intent to redeem the Bonds on April 3, 1998. Cendant's notice was based on a provision in the Bonds' Indenture permitting Cendant to call the Bonds at any time after March of 1998 if Cendant's common stock had met a certain trigger price for a certain number of days. In response to the notice of redemption, the Reliant Plaintiffs converted their Bonds into Cendant common stock on April 6, 1998, as Cendant assumed all bondholders would. *Three days later* – if you believe their story – Cendant's current executives "first learned" of accounting irregularities at the company. Nine days later, on April 15, 1998, the company announced its "discovery" to the public, sending its stock's price plummeting. The Reliant Plaintiffs immediately asked to rescind their conversion of the Bonds; Cendant refused; ultimately this lawsuit ensued.

The Reliant Plaintiffs' motion for summary judgment hews to the following simple logic: (1) the Indenture constituted an enforceable contract; (2) Cendant, through many of its senior officers, perpetrated a massive accounting fraud; (3) the accounting fraud inflated the price of its stock; (4) but for the stock price inflation, under the terms of the Indenture, Cendant could not have redeemed the Bonds in April 1998 or indeed at any time thereafter prior to their maturity; (5) the Reliant Plaintiffs' were injured by converting their Bonds in reaction to the notice of redemption; and (6) meanwhile Cendant, by obtaining the Bonds in exchange for stock, was able

- 1 -

to wipe nearly $100 million in debt off its books for free – a windfall under any definition of the term. *Cendant concedes all of these central points,* including the fact that the Reliant Plaintiffs suffered multi-million dollar damages on the Bonds.

Given these concessions on the central points, Cendant's opposition to the Reliant Plaintiffs' motion for summary judgment necessarily relies on a series of desperate and tangential misreadings of both the applicable law and the facts.[1]

First, Cendant argues in support of its cross-motion for judgment on the pleadings that the "no action" clause in the Indenture bars the Reliant Plaintiffs' claims. Cendant is wrong. The Reliant Plaintiffs are suing for the return of the value of the Bonds themselves, a suit which is essentially a suit for the "principal and interest" owed them by Cendant, and a type of suit that is not only not barred by the "no action" clause, but is expressly permitted by the Indenture. Moreover, post-conversion, the Reliant Plaintiffs were no longer "holders" of the Bonds, so the "no action" clause does not apply to them in any event. Finally, Cendant fails to tell the Court how as a practical matter the Reliant Plaintiffs could comply with the "no action" clause, as the Indenture Trustee for the Bonds has long been discharged. For all of these reasons, Cendant's motion for judgment on the pleadings to enforce the "no action" clause should be denied.

Second, Cendant argues in opposition to the Reliant Plaintiffs' motion for summary judgment that "culpable intent" on the part of Cendant in noticing the redemption of the Bonds

---

[1] Cendant's brief is also unfortunately colored at the outset by an attack on the motives of the Reliant Plaintiffs – Cendant accuses them of exhibiting "a form of greed that rarely is encountered," apparently on the odd theory that it is somehow all right to breach contracts with hedge funds because they are "professional traders, who routinely engage in highly-sophisticated trading techniques." *See* Defendant Cendant Corporation's Memorandum of Law ("Cendant Mem.") at p. 1. This bizarre attack need not be dignified by any substantive response, however, other than to note the obvious – that a company whose most senior officers perpetrated what Cendant concedes was "one of the largest accounting frauds in U.S. history," should not be heard to lecture innocent third parties about "greed."

- 2 -

has not been established. Again, Cendant is wrong. The knowledge of the accounting fraud by Cendant officers and directors – including the former CUC executives Walter Forbes, E. Kirk Shelton, Cosmo Corigliano, Caspar Sabatino, Anne Pember, and others – has long been established by Cendant's own pleadings. Cendant's argument that this knowledge should not be imputed to the corporation – the corporation, after all, was the party that noticed the redemption, not individual officers – hinges on its renewed argument for the application of the "adverse agent" exception to imputation. But, as the Reliant Plaintiffs demonstrated in their principal brief, as a matter of black-letter law the adverse agent exception has no application (a) to a breach of contract claim brought by an innocent third party or (b) where, as here, the corporate principal has retained a benefit resulting from its agents' conduct. Cendant's response does not even attempt to contradict these basic principles of agency law.

Finally, Cendant argues that the Reliant Plaintiffs' damages arising out of the conversion of the Bonds should be offset by alleged gains the Reliant Plaintiffs achieved on separate transactions in other Cendant securities. Cendant's argument again hinges, however, on an attempt to avoid the fact that the Reliant Plaintiffs' motion focuses on a *breach of contract* claim. Contract law is clear that the type of offsetting of separate transactions that Cendant proposes is simply not applicable to a breach of contract claim, nor is it applicable where, as here, the offset would result in Cendant's unjust enrichment. Put simply, the Reliant Plaintiffs are entitled to the benefit of their particular bargain with regard to the Bonds. That bargain gave Cendant the right to notice redemption of the Bonds only if certain conditions were met. Those conditions were not met, yet Cendant noticed the redemption. That notice forced the Reliant Plaintiffs to convert their Bonds, and caused them damages, as Cendant concedes, while Cendant, because of the conversion, was able to retire tens of millions of dollars in debt at no cost to itself.

- 3 -

The Reliant Plaintiffs' motion for summary judgment should be granted.

## **RESPONSE TO CENDANT'S COUNTER-STATEMENT OF MATERIAL FACTS**

Pursuant to Local Civil Rule 56.1, the Reliant Plaintiffs submitted a Statement Of

Undisputed Material Facts ("SUF") in support of their motion for summary judgment.

Cendant's response to the Reliant Plaintiffs' SUF, together with the Declaration of its expert, Dr.

Marcia Kramer Mayer, does not dispute the following core facts that are material to the Reliant

Plaintiffs' motion for summary judgment:

- The trigger price for redemption of the Bonds was $38.86, significantly above their face value of $27.76. *See* Defendant Cendant Corporation's Local Civil Rule 56.1 Statement of Material Facts ("Cendant Statement"), ¶ 2 (responding to SUF ¶ 11).

- If holders of the Bonds converted, Cendant could retire debt using authorized but unissued stock held in its treasury rather than cash. *See* SUF ¶ 11 (not contested in Cendant Statement).

- Holders of $95.5 million of the $240 million in outstanding Bonds converted after receipt of Cendant's April 3, 1998 notice of redemption. *Id.* (not contested in Cendant Statement).

- The Report of Cendant's Audit Committee dated August 28, 1998 admitted that "numerous accounting irregularities and improper accounting practices occurred at CUC which had the effect of inflating revenues or decreasing expenses." *See* Cendant Statement, ¶ 3 (responding to SUF ¶ 12).[2]

- Cendant has affirmatively alleged in pleadings in this matter that "CUC's corrupt senior executives and managers" artificially inflated the company's income, fabricating hundreds of millions of dollars in fictitious income, and thereby "turned the company into a fraud factory." *Id.*, ¶¶ 4-6 (responding to SUF ¶¶ 13-14, 16).

---

[2] The Court will notice that the bulk of Cendant's "counterstatement" of material facts is actually a series of concessions in which Cendant concedes the facts while simply providing fuller quotations from the underlying record, none of which alter the meaning of the statements or create issues of disputed fact. *See, e.g.*, Cendant Statement, ¶¶ 3-9.

- The scheme involved virtually the entire management of CUC, including Walter Forbes, Kirk Shelton, Cosmo Corigliano, Caspar Sabatino and Anne Pember. *See* SUF, ¶ 15 (not contested in Cendant Statement).

- Their accounting fraud had the effect of inflating the price of CUC and Cendant shares, with Cendant shares being inflated by a minimum of $18.24 per share. *See* Cendant Statement, ¶¶ 7-8 (responding to SUF ¶¶ 17-18).

- Cendant was thus only able to issue the April 3, 1998 notice of redemption the Bonds because of the inflation caused by the accounting fraud. *See* Declaration of Marcia Kramer Mayer, June 15, 2005 ("Mayer Decl."), ¶ 105 ("Redemption of the 4.75% Notes would not have been an option for the Company, but for the fraud, because the shares never had a true value as high as the $38.86 trigger price..."); *see also*, *id.*, Exhibit 11 ("The True Value of Cendant Stock Never Hit the $38.86 'Trigger' Price for Redemption of the 4.75% Notes").

- Conversion of their Bonds injured the Reliant Plaintiffs. *Id.*, ¶ 122 ("On conversion, Reliant was disadvantaged again as it exchanged overpriced Cendant 4.75% Notes for even more overpriced Cendant shares.") and ¶ 136 ("Shepherd was disadvantaged by exchanging 4.75% Notes carrying an aggregate inflation").

- The Reliant Plaintiffs owned $18,881,000 par value of the Bonds. The redemption value of the Reliant Plaintiffs' Bonds pursuant to the April 3, 1998 notice of redemption issued by Cendant would have been $19,521,632.33. *See* SUF ¶ 20 (not contested in Cendant Statement).

- Instead, the Reliant Plaintiffs received 680,244 shares of Cendant stock upon conversion of their bonds. *See* Cendant Statement, ¶ 10, which simply restates (and thereby admits) SUF ¶ 21.

- Cendant stock fell to $19.0625 per share on April 16, 1998, after Cendant's initial announcement of the accounting fraud; to $15.6875 after Cendant's July 14, 1998 announcement that it would restate CUC's financial statements for 1995 and 1996; and to $11.625 on August 31, 1998, the first trading day after Cendant filed its Audit Committee's report on the fraud. *See* SUF ¶¶ 22-24 (not contested in the Cendant Statement); *see also*, SUF ¶ 25 (first sentence).[3]

- The Reliant Plaintiffs contacted Cendant to request rescission of the conversion of their bonds and demanded return of the Bonds or their cash value, but Cendant

---

[3] Cendant purports to dispute the entirety of SUF ¶ 25, but the first sentence of the paragraph simply states the stock price of Cendant on August 31, 1998, $11.625, the first trading day after the release of the August 28, 1998 Audit Committee Report, a fact which had been included (and therefore conceded) in Dr. Mayer's January 26, 2001 Certification.

- 5 -

refused to rescind the conversion. *See* SUF, ¶¶ 26-27 (not contested in the
Cendant Statement).

## ARGUMENT

I.     **CENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS MUST BE
       DENIED BECAUSE THE NO-ACTION CLAUSE IN THE INDENTURE DOES
       NOT BAR THE RELIANT PLAINTIFFS' BREACH OF CONTRACT CLAIM.**

Cendant's sole argument in support of its cross-motion for judgment on the pleadings is

at once its most picayune and least practical – that the "no action" clause in the Indenture bars

breach of contract claims by bondholders like the Reliant Plaintiffs unless they have first

contacted the Indenture Trustee, requested that the Trustee bring the claims, and the Trustee has

refused. *See* Cendant Mem., pp. 9-13. Cendant's attempt to escape liability through the no-

action clause, six years after this suit was brought and *after the trustee for the Indenture has long

since been discharged,* is wrong legally and, as practical matter, is moot.

A.     **The Reliant Plaintiffs Have An Absolute Right To Sue For Principal
       And Interest.**

First, the Reliant Plaintiffs' breach of contract claim is not barred by the Indenture's no

action clause because the Reliant Plaintiffs are suing for rescission of their conversion of the

Bonds. Put simply, the Reliant Plaintiffs seek the return of the value of the Bonds themselves,

*i.e.,* the principal and interest that would have been due them had Cendant not wrongfully issued

the notice of redemption. Section 508 of the Indenture, entitled "Unconditional Right of Holders

to Receive Principal, Premium and Interest," specifically exempts this kind of suit from the

effect of the no-action clause, permitting bondholders seeking principal and interest to bypass the

Indenture Trustee. *See* Declaration of Peter Pearlman ("Pearlman Decl."), Exh. C. Indeed,

such provisions are required by § 316(b) of the Trust Indenture Act of 1939, 15 U.S.C. §

77ppp(b), and create an "absolute right to institute suit after nonpayment of principal or interest."

*See Cruden v. Bank of New York*, 957 F.2d 961, 968 (2nd Cir. 1992). In this case, that

- 6 -

nonpayment occurred when Cendant refused to rescind the Reliant Plaintiffs' forced conversion even after Cendant had disclosed the existence of the accounting fraud, at the same time they were redeeming for full value the majority of the Bonds, whose holders had fortuitously delayed converting.[4]

Cendant nevertheless argues -- albeit only in a footnote -- that the "Unconditional Right" provision of the Indenture does not apply to the Reliant Plaintiffs' action, because the Reliant Plaintiffs do not claim "that, while the 4 ¾% Notes were outstanding, Cendant defaulted on any obligation to pay interest when it was due or to return principal upon maturity." *See* Cendant Mem., p. 13 n. 6. Instead, Cendant argues, the Reliant Plaintiffs only seek principal and interest as a "measure of damages." *Id.* But the few cases that have addressed such "bypass clauses" in Indentures hold that the absolute right to sue for the principal and interest must be broadly

---

[4] Although not ultimately material to the Reliant Plaintiffs' motion, Cendant purports to dispute the fact that the notice of redemption effectively *forced* bondholders who acted rationally to convert. *See* Cendant Statement, ¶ 3. Cendant's objection to this statement of fact is unsupported by any evidence or economic logic. As shown above, Cendant admits that the trigger price for redemption of the Bonds was $38.86 per share. Cendant also admits that the value the company would give bondholders at redemption was the equivalent of $27.76 per share. It is not economics, but closer to arithmetic, to conclude that a rational actor would opt to convert (and receive $38 shares) rather than wait for redemption (and receive the cash equivalent of $27 shares) – at least until the April 15, 1998 announcement of Cendant's accounting fraud, when the reverse would be true, because the stock price had plunged far below $27 per share. Notably, Cendant's economist expert, Dr. Marcia Kramer Mayer, has not been asked to opine that the notice of redemption was anything other than a forced conversion for those bondholders who acted promptly, *i.e.*, in the 12 days between the notice of redemption on April 3, 1998 and the disclosure of the accounting fraud on April 15th. And, of course, Cendant's own SEC filings admit that they expected all of the bondholders to convert. *See* Form 10-K/A, Cendant Corporation, October 12, 1999, Item 7, "Management's Discussion and Analysis," section entitled, "Financing Costs," relevant excerpts of which are attached to the Supplemental Declaration of Peter Pearlman ("Pearlman Supp.") as Exh. A ("Additionally, during 1998, we exercised our option to redeem our 4-3/4% Convertible Senior Notes…. At such time, *we anticipated that all holders of the 4 3/4% Notes would elect to convert* the 4 3/4% Notes to our common stock.") (emphasis added).

construed in favor of the bondholder[5]: the form of the action or the particular cause of action alleged is not controlling; neither is whether the principal and interest is past due; rather, the issue is whether plaintiff seeks principal and interest in any manner as its remedy. *See, e.g., Continental Casualty Co. v. State of New York Mortgage Agency*, 1998 WL 513054 (S.D.N.Y.)(suit for interest that accrued after suit not barred because no express language limiting application of no-action clause to suits for *unpaid* principal and interest); *Envirodyne Industries, Inc. v. Connecticut Mutual Life Ins. Co*, 174 B.R. 986 (N.D. Ill. 1994)(petition for involuntary bankruptcy filed by small number of bondholders fell within exception to no-action clause because it could be construed as a suit to obtain payment of delinquent interest); *UPIC & Co. v. Kinder-Care Learning Centers, Inc.,* 793 F.Supp. 448, 450-55 (S.D.N.Y. 1992)(action against issuer for failure to repurchase notes was suit for principal and interest to which no action clause did not apply).[6] Thus, the fact that the Reliant Plaintiffs seek principal and interest as a "measure of damages" makes their point, not Cendant's.

Here, the Reliant Plaintiffs' expressly seek the "rescission of their conversion of the Bonds into Cendant stock, *i.e.,* the return of the Bonds and all accrued interest, or the cash

---

[5] Conversely, courts have uniformly held that no action clauses are strictly construed against the issuer. *See Cruden v. Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992).

[6] Two relatively recent unpublished cases from Delaware's Superior Court, perhaps the nation's preeminent business law jurisdiction, also strongly suggest that that the type of action brought by the Reliant Plaintiffs is not barred by the Indenture's no-action clause. In *JAS Securities LLP v. Merrill Lynch & Co.,* 2000 WL 303313, *3 (Del. Super.), for instance, the Court held that an Indenture's "bypass clause" permitting suits for principal and interest "contemplate[d] direct claims by holders that allege failure to pay the Applicable Redemption Price," and that "thanks to the bypass clause, Plaintiff does not have to involve the trustee before it sues Defendant." Similarly, in *Tomei v. Globalstar Capital Corp.*, 2001 WL 1729853 (Del.Super.), bondholders were permitted to sue an issuer directly for non-payment of principal and interest, even though the bonds had not matured and no interest was past due, where the issuer had publicly announced they would discontinue future payments under the bonds; the court held that "the remedies sought by the Plaintiffs fall outside the parameters of the 'no action clause.'"

- 8 -

equivalent as damages." *See* Brief in Support of Motion for Summary Judgment ("Reliant Br."),

p. 10. This pursuit of principal and interest as damages exempts the Reliant Plaintiffs from

compliance with the no-action clause.

**B.      The Reliant Plaintiffs, As *Former* Holders Of The Bonds, Were Exempted From Compliance With The No-Action Clause.**

Second, the no-action clause in the Indenture on its face applies solely to "holders" of

"Outstanding Securities." "Holders" is defined by the Indenture as "the Person in whose name a

Security is registered in the Security Register." *See* Pearlman Decl., Exh. C, p. 8. Meanwhile,

the Indenture defines "Outstanding Securities" as securities that have not been cancelled by the

Trustee, securities that have not been redeemed, or securities that have been converted to other

securities." *Id.*, pp. 10-11. It is undisputed that all $240 million of the Bonds were either

converted or redeemed in April and May 1998. *Id.*, Exh. H. Thus, when the Reliant Plaintiffs

filed their lawsuit against Cendant in the spring of 1999, there were no "holders" of "outstanding

securities," and therefore the no action clause was not applicable.

In *Rossdeutscher v. Viacom, Inc.*, 768 A.2d 8, 22 (Del. 2001), the Supreme Court of

Delaware concluded after a detailed discussion that a no action clause did not apply to a plaintiff

who was "no longer a 'Holder'" after its bonds had been redeemed, and noted that "[t]his is a

common sense result." It is also a result that comports with the rationale for including no action

clauses in Indentures in the first place, which is to "prevent individual holders from getting

special advantages for themselves and protect the rights and security of all holders as a class."

*See Birn v. Childs Co.*, 37 N.Y.S.2d 689, 696 (1942); *see also, Batchelder v. Council Grove*

*Water Co.*, 131 N.Y. 42, 29 N.E. 801 (1892)(no action clause "prevents individual bondholders

from pursuing an individual course of action, and thus harassing their common debtor, and

jeopardizing the fund provided for the common benefit"); *Feldbaum v. McRory*, 1992 WL

- 9 -

119095 (Del.Ch.)("[t]he primary purpose of a no-action clause is to... protect bondholders....
against the exercise of poor judgment by a single bondholder or a small group of bondholders,
who might otherwise bring a suit against the issuer that most bondholders would consider not to
be in their collective economic interest").   Where, as here, all of the Bonds have either been
redeemed or converted, there are no bondholders left in need of protection, and hence no purpose
supporting application of a no action clause.

In response to *Rossdeutscher*'s persuasive commentary, Cendant hinges its argument for
application of the Indenture's no action clause to former bondholders on a single New York
decision, *Bank of New York v. Battery Park City Authority*, 251 A.D.2d 211, 675 N.Y.S.2d 860,
860-861 (1st Dept. 1998).   *See* Cendant Mem., pp. 11-13.   But *Bank of New York* is a one-
paragraph, summary affirmance of a trial court's decision on a motion to dismiss that provides
no details regarding the indenture at issue or the circumstances under which the suit was
brought, and no substantive legal discussion or analysis justifying application of the no action
clause to bar the plaintiffs' claims.   Indeed, the decision in *Bank of New York* to enforce the no
action clause is *dicta*, as the Court had already affirmed the lower court's decision on different
grounds and noted that the no action clause was "a ground not reached by the motion court."
Finally, the position stated by *Bank of New York* may not even be settled law in the First
Department of New York.   *See Acacia Nat'l Life Ins. Co. v. Kay Jewelers, Inc.*, 203 A.D. 40,
42-43, 610 N.Y.S.2d 209, 212 (1st Dept. 1994)(whether no action clause of Indenture applied to
former noteholder could not be determined on motion to dismiss).

In short, *Bank of New York* is a very slender reed on which Cendant places nearly its
entire argument for application of the no action clause.   *Rossdeutscher*, decided after *Bank of
New York*, described it as "cryptic language in a summary affirmance," and held that it did not

- 10 -

control "either as a matter of *stare decisis* or common sense." 768 A.2d at 23.[7] This Court is in an identical position with the *Rossdeutscher* court in trying to conclude what New York law on this issue might be in the absence of a decision from New York's highest court; it should reach the same conclusion.

### C.   The Reliant Plaintiffs are Excused from Compliance with the No-Action Clause Because The Trustee Has Been Discharged.

Finally, Cendant's insistence on the enforcement of the no action clause begs the practical question of whether the Reliant Plaintiffs could have complied with the clause even if they had tried. The Bonds were all redeemed or converted in April and May of 1998. As noted above, there were thus no "holders" of "outstanding securities" at the time the Reliant Plaintiffs brought suit against Cendant. But there was also *no trustee* whom the Reliant Plaintiffs could have notified, because the Indenture by its terms was discharged when all of the bonds were redeemed or converted. *See* Pearlman Decl., Exh. C, pp. 48-50 (Section 401, "Satisfaction and Discharge of Indenture"). Cendant's own 10-Ks appear to confirm that the Indentures were discharged no later than 1999, because 10Ks for subsequent years do not append the Indenture as an Exhibit. *See* Pearlman Supp., ¶ 3 and Exh. B. In any event, Cendant has made no showing that the Trustee for the Bonds was still engaged at the time the Reliant Plaintiffs brought suit in 1999[8], although it is their burden to do so, as their attempt to enforce the no action clause is an affirmative defense.

---

[7] The only other decision to cite *Bank of New York* favorably is the unreported decision in *Continental Casualty Co. v. State of New York Mortgage Agency*, 1998 WL 513054, *4 (S.D.N.Y.). But the court in *Continental Casualty* ultimately permitted the former bondholders' suit to go forward because, as here, it sought payment of principal and interest. *Id.*

[8] Certainly Cendant is not suggesting that the Reliant Plaintiffs could comply now, two years after the 2003 maturity date for the Bonds, even assuming that they had not been redeemed in 1998. Yet Cendant's motion for judgment on the pleadings seeks dismissal of the Reliant Plaintiffs' claims on procedural grounds and thus *without prejudice*; the statute of limitations for

- 11 -

Cases considering enforcement of no action clauses uniformly hold that a prerequisite for such enforcement is an *active* trustee competent to act if notified. *See Campbell v. Hudson & Manhattan R. Co.*, 277 A.D. 731, 734, 102 N.Y.S.2d 878, 881 (1st Dept. 1951)("[a]ll of those cases, and others like them, presuppose a trustee competent to act"); *Feldman v. McCrory*, 1992 WL 119095, *7 (Del.Ch.)(bondholders excused from compliance with no action clause if trustee is "incapable of... performing that duty"); *Townsend v. Milaca Motor Co.*, 260 N.W. 525, 527 (Minn. 1935)(bondholders excused from compliance where trustee is "wholly dormant... [f]or the purposes of the trust it no longer exists"). Why the trustee is incapable of performing its duties is immaterial. *See Campbell*, 102 N.Y.S.2d at 882-83 ("It matters little to the point whether the inability of the trustee to make up its mind is self-created or comes from misfortune beyond its control. In either instance, a bondholder may sue... if the trustee is unable to form a judgment from whatever cause."); *Townsend,* 260 N.W. at 528 (Minn. 1935)(bondholder may sue without complying with no action clause "if for any reason the trustee has rendered himself unfit to proceed").

Here, where the Indenture Trustee has undoubtedly long since been discharged, Cendant's argument that the Reliant Plaintiffs should comply with the no action clause is moot. Accordingly, Cendant's motion for judgment on the pleadings should be denied.

---

the Reliant Plaintiffs' claim for breach of contract – six years under New York law – has been tolled during the pendency of the action; and therefore, even were the claim dismissed, the Reliant Plaintiffs would be entitled to replead the claim after complying with the no action clause. (Notably, the Reliant Plaintiffs, Kennilworth and Soundshore together would represent significantly more than 25% of the Bonds that were not redeemed.) The Trustee, notified so many years after his discharge, would undoubtedly refuse to undertake the action. The result of Cendant's argument would thus be that the Reliant Plaintiffs would be forced to jump through some procedural hoops before emerging right back in this Court with the same claim. Again, this result beggars common sense.

- 12 -

## II. THE RELIANT PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED.

The Reliant Plaintiffs have moved for summary judgment only on their breach of contract claim, which alleges that the April 3, 1998 notice of redemption issued by Cendant breached the Indenture for the Bonds because the condition precedent for redemption – that Cendant's common stock would have met a trigger price for a certain number of trading days – would not have been met but for the company's accounting fraud. Cendant opposes the Reliant Plaintiffs' motion on two grounds, one directed to liability, the other to damages.

First, with regard to their liability, Cendant argues that the Reliant Plaintiffs have failed to establish "culpable intent" on the part of Cendant with regard to its April 3, 1998 notice of redemption for the Bonds, *i.e.*, that Cendant had knowledge that the "trigger price" necessary to exercise its redemption right had only been met because of its accounting fraud, and nevertheless issued the notice of redemption "intentionally and purposely." *See* Cendant Mem., pp. 14-18, *citing Chem. Bank v. Stahl*, 712 N.Y.S.2d 452, 462 (App.Div. 2000).

Second, with regard to the Reliant Plaintiffs' damages, Cendant argues that, even if Cendant is found liable for breach of the Indenture, the Reliant Plaintiffs, both of which are hedge funds, have suffered no damages at all because they allegedly made profits in separate transactions in Cendant securities, and that those profits should be offset against its losses on the Bonds. *See* Cendant Mem., pp. 27-31. As shown above, Cendant concedes that the Reliant Plaintiffs suffered multi-million dollar losses on the Bonds *per se*.

- 13 -

Neither of Cendant's arguments has merit because, in both cases, Cendant does not understand and apply the relevant, basic principles of contract law.[9]  The Reliant Plaintiffs' motion for summary judgment should be granted.

## A.     Knowledge Of The Fraud By Cendant Officers At The Time Of The Notice Of Redemption Must Be Imputed To The Corporation.

Culpable intent, Cendant argues, is a necessary element of the Reliant Plaintiffs' claim for breach of the Indenture, because the claim is essentially one for breach of a duty of good faith and fair dealing based on Cendant acting in such a way (noticing the redemption based on a fraudulently-inflated trigger price) that had the effect of destroying the Reliant Plaintiffs' rights to receive the benefit of their contract.  *See* Cendant Mem., p. 14; *see also, Dalton v. Educational Testing Serv.*, 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 979, 663 N.E.2d 289 (1995) (stating rule).   Cendant contends that the Reliant Plaintiffs' summary judgment motion must be denied because they have failed to establish such culpable intent.

Cendant is wrong.   Culpable intent on the part of Cendant has, in fact, been established. As the Court is all-too-aware, Cendant has long conceded that many Cendant officers at the time of the redemption notice were parties to its accounting fraud, including the company's original Chairman, Walter Forbes, and his subalterns at CUC and Cendant, E. Kirk Shelton, Cosmo Corigliano, Caspar Sabatino, Anne Pember and others.   Under basic agency law, these Cendant officers' knowledge of the fraud would generally be imputed to the corporation.  *See, e.g., Center v. Hampton Affiliates, Inc.*, 497 N.Y.S.2d 898, 899 (Ct.App. 1985)("general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually

---

[9] Cendant does not dispute that the Indenture is an enforceable contract and that contract law principles apply to the performance and enforcement of indenture agreements generally.  *See Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 957-58 (5th Cir. 1981)(applying New York law).

- 14 -

communicated to it"). Such imputed knowledge would necessarily mean that the April 3, 1998 notice of redemption was issued knowingly, *i.e.*, "intentionally and purposely."

Cendant attempts to avoid imputation to the corporation of these officers' knowledge of the fraud – and hence of the inflation of the company's stock price triggering the company's "right" to redeem the Bonds – by arguing that the Reliant Plaintiffs must show that these officers were not "acting adversely" to the interests of Cendant. *See* Cendant Mem., p. 16. In making this argument, Cendant relies on this Court's decision in the *Yeager* case, in which it successfully forestalled summary judgment using this "adverse agent" exception to imputation of knowledge of the fraud by its officers to the corporation. *Id.*, p. 17.

The problem with this argument is that *Yeager* was deciding a motion brought on a securities fraud claim, while the present motion is on a breach of contract claim. Cendant pretends that this difference is irrelevant – hence its consistent reference to securities fraud decisions on "scienter" in support of its position[10] – but, to the contrary, the fact that the Reliant Plaintiffs' are moving on a breach of contract claim makes all the difference.

### 1.   The "adverse agent" exception to imputation is not applicable to a breach of contract claim.

First, as the Reliant Plaintiffs argued in their principal brief, the "adverse agent" exception is simply not available where "the failure of the agent to act upon or reveal the information results in a violation of a *contractual* or relational duty of the principal to a person harmed thereby." *See* Restatement (Second) of Agency, § 282(2)(a) (emphasis added). Put

---

[10] Although the Reliant Plaintiffs did not move for summary judgment on their 10b-5 claim, they agree with the Kennilworth Plaintiffs that events since the Court's August 2000 *Yeager* decision have changed the landscape on the scienter issue too – including most prominently the criminal convictions for securities fraud of E. Kirk Shelton, the President and Chief Operating Officer of CUC and Cendant's former Vice-Chairman, and Cosmo Corigliano, the Chief Financial Officer of CUC and Cendant's Senior Vice President. *See* Memorandum of Kennilworth Partners et al. in Support of Motion for Summary Judgment, pp. 11-13.

differently, and more broadly, notice of a fact known by an agent is imputed to a principal "when necessary to protect the rights of a third party who dealt with the principal in good faith." *See* Restatement (Third) of Agency, § 5.04(a) (Tentative Draft No. 6, 2005); *see also, id.*, comment b ("the adverse-interest exception to imputation does not defeat the rights of a third party who dealt in good faith with the principal"). These basic principles of agency law have long been accepted in New York and elsewhere. *See, e.g.*, 3 N.Y.JUR.2d *Agency and Independent Contractors*, § 268; *Greene v. Cuykendall*, 40 N.Y.S.2d 801 (Supr.1943); *Sunrise Properties, Inc. v. Bacon, Wilson, et al.*, 679 N.E.2d 540, 543 (Mass. 1997) (where failure by agent to share knowledge with principle resulted in noncompliance with terms of contract, knowledge was imputed to principal under Restatement (Second) of Agency, § 282(2)(a)). The logic underlying this rule is that the principal "should be the loser in such case, and not the innocent party who relied thereon." 3 N.Y.JUR.2d *Agency and Independent Contractors*, § 249.

Here, too, Cendant, and not the Reliant Plaintiffs, should be the loser if Walter Forbes and his CUC cohorts failed to inform Henry Silverman and his HFS group of the facts underlying their accounting fraud. Because those facts would have alerted Cendant that the "trigger price" for redemption of the Bonds had not been met legitimately, their failure caused Cendant to breach the Indenture and caused injury to innocent third parties like the Reliant Plaintiffs. Under these circumstances, as shown above, it is basic agency law that the "adverse agent" exception may not be invoked. Although the Reliant Plaintiffs made this argument about the unavailability of the "adverse agent" exception in the context of a breach of contract claim explicitly in their principal brief, *see* Reliant Br., pp. 14-15, it is telling that Cendant does not even attempt to contradict this settled law in its response.

- 16 -

### 2. The "adverse agent" exception to imputation is not available where the principal has knowingly retained a benefit.

A second well-recognized exception to the "adverse agent" rule is equally applicable here: that knowledge of an agent is imputed to the principal, even where the agent is acting adversely, if the principal "knowingly retains a benefit through the act of an agent which otherwise he would not have received." *See* Restatement (Second) of Agency, § 282(2)(c); Restatement (Third) of Agency, § 5.04 (Tentative Draft No. 6, 2005), comment d ("the adverse-interest exception... should not serve as a sword that enables a principal knowingly to retain the benefits of its agent's wrongdoing"); *Marine Midland Bank v. John E. Russo Produce Co., Inc.*, 50 NY.2d 31, 44 (1980)("[a] principal that accepts the benefits of its agent's misdeeds is estopped to deny knowledge of facts of which the agent was aware"); *National Credit Union Admin. v. Ticor Title Insurance Co.*, 873 F.Supp. 718, 726 (D.Mass. 1995)("the principal cannot claim the advantages of the bad acts of its officers without assuming the imputation of their knowledge"). In effect, retaining the benefits of the fraud ratifies the agent's conduct, justifying imputation to the principal.

Here, it is undisputed that Cendant was able to retire $240 million in debt through the conversion or redemption of its 4 ¾ % convertible bonds in April 1998, transactions that Cendant was only able to effectuate due to the inflation of its stock price caused by the accounting fraud its senior officers helped perpetrate. It is also undisputed that, even after Cendant "discovered" the accounting fraud in mid-April 1998 – again, accepting the company's current story that the executives from the HFS side of the company didn't discover the fraud earlier as true for the purposes of this motion[11] – Cendant refused to rescind the conversions of

---

[11] Needless to say, the Reliant Plaintiffs do not credit this self-serving story. Although not ultimately material to the present Motion for breach of contract, as the Court is aware, there is

the Reliant Plaintiffs and other similarly-situated former bondholders, thereby knowingly

retaining the benefits of the fraud.   Again, these undisputed facts make the "adverse agent"

exception unavailable to Cendant.   And, again, although the Reliant Plaintiffs raised this

argument in their principal brief, *See* Reliant Br., pp. 15-16, it is telling that Cendant makes no

effort to contradict this settled law.

Cendant's attempt to invoke the adverse agent exception to avoid liability for its

executives' actions should be rejected.

---

abundant evidence in Cendant's own Audit Committee Report that the former HFS executives
Henry Silverman, Scott Forbes and Michael Monaco had sufficient information prior to April 3,
1998 to alert them that the notice of redemption for the Bonds was improper.  *See* Report of
Audit Committee, August 28, 1998 ("RAC"), relevant excerpts of which are attached to
Pearlman Supp. as Exhibit C.  For instance, two months earlier, on February 2, 1998, Scott
Forbes had received a report from his staff showing significant segment to segment differences
between CUC revenue figures he had received from Corigliano and Pember (RAC, pp. 257-58);
the next day, on February 3, 1998, Silverman, Monaco and Scott Forbes signed a separate
management representation letter to E&Y stating their "lack of awareness" of information that
would change the company's representations (RAC, p. 178).  Then, in late February, Silverman
told Walter Forbes and Shelton that he wanted financial reporting from CUC units to go through
Scott Forbes, not Pember (RAC, p. 56); and, in early March, told them that the replacement of
Pember, the former controller of CUC, could not wait (RAC, p. 57).  On March 6, 1998, Scott
Forbes met with Shelton, Corigliano and Pember, and reported that Shelton asked him to "be
creative" to reverse $165 million in merger reserves into income for 1998; Scott Forbes called
Monaco and Silverman that night to tell them about the meeting (RAC, pp. 57-58); all three were
concerned and Silverman called an emergency Sunday morning meeting of the key executives of
the former HFS to discuss the accounting issues on March 8,1998 (RAC, p. 62).  The next day,
Silverman, Scott Forbes and Shelton met with Walter Forbes, Shelton and Corigliano; Silverman
"expressed surprise and dismay over the percentage of non-recurring income shown for 1997,
and indicated that he felt he had been *misled* by CUC as to this fact.  He also said he had been
*misled* by CUC in that no one had told him that in order to meet budget in 1998 the company
would have to take $165 million of reserves into revenues."  (RAC, pp. 62-63, emphasis added).
Later in March, Silverman told Walter Forbes that he wanted Shelton and Corigliano to leave the
company – the company's former President and Chief Financial Officer – thus completing a
purge of the officers who had been in charge of CUC's finances.  (RAC, p. 67)  Put bluntly, if
Silverman already felt that he had been misled in March 1998, and had already acted on that
knowledge to purge the most senior financial officers of CUC from Cendant, how exactly did he
justify sending out the April 3, 1998 notices of redemption to bondholders who hadn't been
informed about what he had learned and what he was already doing?

**B.      Offsetting Gains On *Separate* Transactions Is Inappropriate In Considering Damages For Breach Of Contract.**

Cendant, through its expert, Dr. Mayer, concedes that the Reliant Plaintiffs were injured by Cendant's issuance of the April 3, 1998 notice of redemption and their subsequent conversion of the Bonds. *See* Mayer Decl., ¶ 122 ("On conversion, Reliant was disadvantaged again as it exchanged overpriced Cendant 4.75% Notes for even more overpriced Cendant shares... The 340,140 Cendant shares that it acquired in the process were on aggregate inflated by $6,211,843. On net, the conversion thus harmed Reliant by adding $2,321,157 in inflated market value to its portfolio."); ¶ 123 ("All bond transactions taken together generated $4,896,014 in Total Net Loss... for Reliant."); ¶ 136 ("Shepherd was disadvantaged by exchanging 4.75% Notes carrying an aggregate inflation of $3,890,274 for shares with an aggregate inflation of $6,211,185. On net, the conversion damaged Shepherd by adding $2,320,911 in inflated market value to its portfolio."). Dr. Mayer summarizes her conclusions as follows: "Net loss associated with Cendant's issuance of a redemption notice is the difference: $2,321,157 for Reliant and $2,320,911 for Shepherd." *Id.*, ¶ 138. Dr. Mayer thus concedes that, under her damages model, the amount of the Reliant Plaintiffs' collective injury from the notice of redemption and their conversion of the Bonds was *at least* the sum of her two figures for Reliant's and Shepherd's damages, or $4,642,068.

To avoid its own expert's conclusion that the Reliant Plaintiffs suffered multi-million dollar damages by converting their Bonds, Cendant asks the Court to offset gains they achieved on *different* transactions in Cendant securities over a period of several years. Cendant argues that such gains completely offset the losses Cendant admits the Reliant Plaintiffs incurred caused by the conversion of their Bonds in response to Cendant's April 3, 1998 notice of redemption.

- 19 -

Cendant's argument for offsetting the Reliant Plaintiffs' gains on separate transactions against their admitted injuries in converting the Bonds fails because Cendant ignores basic principles of the law of damages applicable to a breach of contract claim.[12]

### 1. The Reliant Plaintiffs are entitled to the benefit of their bargain.

First, as the Restatement (Second) of Contracts, § 344, makes clear, "when a court concludes that there has been a breach of contract, it enforces the broken promise by protecting the expectation that the injured party had when he made the contract. It does this by attempting to put him in as good a position as he would have been in had the contract been performed, that is, had there been no breach. The interest protected in this way is called the 'expectation interest.' It is sometimes said to give the injured party the 'benefit of the bargain.'" That New York law applies this black-letter "benefit of the bargain" rule for contract damages is not disputed:

> Money damages are substitutional relief designed in theory 'to put the injured party in as good a position as he would have been put by full performance of the contract, at the least cost to the defendant and without charging him with harms that he had no sufficient reason to foresee when he made the contract.' (5 Corbin, Contracts, s 1002, pp. 31--32; 11 Williston, Contracts (3d ed.), s 1338, p. 198.) In other words, so far as possible, the law attempts to secure to the injured party the benefit of his bargain....

---

[12] For the same reason, Dr. Mayer's expert declaration misses the point, since her damages analysis is obviously an analysis of securities fraud damages, not contract damages. *See, e.g.*, Mayer Decl., ¶ 55 ("I utilize different methods to measure the price impact of the fraud on different CUC and Cendant securities"). Moreover, Dr. Mayer's entire analysis – her model of global offsets – depends on her threshold legal conclusion that such offsetting is appropriate. *Id.*, ¶ 100 ("Because a fraud that results in securities mispricing can confer either benefit or harm on an investor, depending on how the investor trades, the relevant loss concept cannot be assessed with reference to a single transaction viewed in isolation. Additional transactions that the investor engages in at prices allegedly distorted by the fraud must also be taken into account."). As shown in this section of the Reliant Plaintiffs' argument, such offsetting is not supported by basic contract law.

- 20 -

*See Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 382, 357 N.Y.S.2d 857, 860 (1974); *see also*, Cendant Mem., pp. 27-28, *citing Alesayi Beverage Corp. v. Canada Dry Corp.*, 947 F.Supp. 658, 671 (S.D.N.Y. 1996)(same).

A threshold question that arises in applying the "benefit of the bargain" rule for damages to this action is thus identifying what particular bargain is at issue. Cendant's argument is essentially that because the Reliant Plaintiffs had a series of "bargains" related to Cendant securities, including contractual arrangements with third party brokers for short sales of Cendant's common stock, and because they may have received the benefit of their bargain with regard to some of those transactions, it should be absolved of responsibility for depriving the Reliant Plaintiffs of the benefit of their bargain with respect to their transactions involving the Bonds. Cendant's position has no basis in contract law. The Reliant Plaintiffs are entitled to enforce each of its "bargains" to receive the full benefits they are entitled to. The bargain at issue here is the Reliant Plaintiffs' purchase of the Bonds under the terms of the Indenture and Cendant's performance under the Indenture, nothing more.

Another threshold question in applying the "benefit of the bargain" rule for breach of contract damages is to identify the particular breach that the Reliant Plaintiffs have alleged for which they are seeking such damages. Again, Cendant's argument hinges on obfuscating this question – to justify looking at all of the Reliant Plaintiffs' transactions over several years, Cendant proceeds as if the breach at issue is its underlying accounting fraud as a whole. *See* Cendant Mem., p. 29 ("any benefits Plaintiffs received from this alleged breach, *i.e.*, fraudulent inflation of Cendant securities, must be applied to offset any damages sustained by Plaintiffs on conversion of their 4 ¾ % Notes."). But the Reliant Plaintiffs do not allege that the accounting fraud *per se* is a breach of the Indenture; rather, the breach of the Indenture is the single,

- 21 -

localized act by Cendant on April 3, 1998 of noticing the redemption of the Bonds where the condition precedent for redemption had not been met *because* of the accounting fraud. *See* Amended Complaint, ¶ 47 (Pearlman Decl., Exh. A) ("The Notice of Redemption, because it was issued at a time when Cendant's stock traded at artificially inflated levels as a result of the defendant's dissemination of false and misleading information, breached the terms of the Indenture.").

With this appropriately narrowed focus, the relevant damages questions under basic contract law are thus clear.   First, the Court must determine what the Reliant Plaintiffs' "expectation interest" was with regard to the particular bargain at issue – the relation between Cendant's redemption rights and bondholders' conversion rights for the Bonds under the Indenture.   Second, the Court must decide how the Reliant Plaintiffs can be compensated for Cendant's particular breach – issuing the April 3, 1998 notice of redemption – so that they get the benefit of that particular bargain.

The Reliant Plaintiffs' expectation interest can be easily stated.   It was the expectation of any holder of a bond, namely, that, absent a legitimate notice of redemption, they could retain the Bonds until maturity, receiving interest during that time, and then receive the principal of the Bonds. In addition, as Cendant concedes, *see* Cendant Mem., pp. 1-2, the Reliant Plaintiffs are hedge funds who typically short sell the common stock of companies in which they hold convertible bonds; such hedge funds, as Cendant is fully aware, "expect" to profit and are entitled to profit when stocks take precipitous declines. *Id*., p. 2, n. 2.

How, then, can the Court compensate the Reliant Plaintiffs for Cendant's breach of the Indenture so that they get the benefit of their bargain, *i.e.*, so that they are "put in as good a position as they would have been in had the contract been performed, that is, had there been no

- 22 -

breach"? Fortunately, the Court need not speculate. As shown above, the holders of the $144.5 million of the Bonds, because they unaccountably delayed converting in response to the April 3, 1998 notice of redemption, were able to receive both the redemption price offered by Cendant and to "cover" their likely short sales with low-priced Cendant stock after the announcement of the fraud, a result that was perfectly legitimate. [13] Those hedge funds were entitled to the benefit of their bargain and received it (albeit inadvertently because they delayed converting); the Reliant Plaintiffs are similarly entitled to the benefit of their bargain.

Put differently, the outcome for those other bondholders of $144.5 million of the Bonds who did not react promptly to Cendant's notice of redemption (as Cendant admits they anticipated all holders would) provides a simple and accurate sense of how to "put [the Reliant Plaintiffs]in as good a position as [they]would have been in had the contract been performed, that is, had there been no breach," as required by contract law of New York and the basic principles of contract damages everywhere else too. The damages that would effectively approximate that outcome for the Reliant Plaintiffs are the rescissory damages they have requested, namely, that the Reliant Plaintiffs recover the value of the Bonds they gave up at the time of the breach, accurately measured by the redemption value paid by Cendant in May 1998, less the true value of the common stock they received upon conversion. Those rescissory damages would give

---

[13] Cendant cannot reasonably dispute that hedge funds were the primary purchaser of its convertible bonds, as they are of convertible bonds generally. *See, e.g.*, "Vicarious Investing; How long can a hedge be a haven?," *New York Times*, September 2, 2001, attached to Pearlman Supp. as Exh. D ("hedge funds have been the largest buyers of convertible bonds this year, accounting for at least 60 percent of the $70 billion in purchases"). Nor can Cendant reasonably dispute that hedge funds "are most successful when the market moves up and down sharply." *Id.*; *see also,* "Hedge Funds' Glitter Fades (But Not For Investors)," *New York Times*, November 5, 2004 (Pearlman Supp., Exh. E) ("Hedge funds make the most money from sharp swings up or down in stocks or other investments."). Cendant's action in noticing the redemption of the Bonds thus arguably injured the bondholders who were hedge funds *more* than it would have had they not been hedge funds, not less, as Cendant intimates.

- 23 -

them the benefit of their bargain and, in effect, treat them equally with the majority of

bondholders who did not convert their bonds in reaction to Cendant's improper notice of

redemption.

### 2. The Reliant Plaintiffs' contract damages are not subject to offsets for profits on separate transactions.

The ultimate issue posed by Cendant's response to the Reliant Plaintiffs' summary

judgment motion is thus whether the admitted damages they suffered on the Bonds can be offset

under contract law principles by profits they achieved on other transactions in different Cendant

securities over a period of months and even years before and after the April 1998 notice of

redemption and forced conversion for the Bonds.   Put bluntly, contract law does not provide for

anything remotely like such global offsetting.

Indeed, contract law provides only for very narrow offsetting under very specific

circumstances.   The Restatement (Second) of Contracts, § 347, defines the appropriate measure

of damages in contract actions as follows: "the injured party has a right to damages based on his

expectation interest as measured by (a) the loss in the value to him of the other party's

performance caused by its failure or deficiency, plus (b) any other loss, including incidental or

consequential loss, caused by the breach, *less (c) any cost or other loss that he has avoided by*

*not having to perform.*"   Comment d to § 347 explains this limited offset to contract damages as

involving situations where "the breach itself results in a saving of some cost that the injured

party would have incurred if he had had to perform," and makes clear that "[l]oss avoided is

subtracted only if the saving results from the injured party not having to perform *rather than*

*from some unrelated event*" (emphasis added).[14]   New York follows this black-letter law.   *See,*

---

[14] Even in tort actions, harm to a plaintiff is offset by benefits conferred on the plaintiff by the
defendant's tortious conduct only to the extent that the benefit is conferred to the same interest of
the plaintiff that was harmed.   *See* Restatement (Second) of Torts, § 920; *see also, id.*, comment

- 24 -

*e.g., Donald Rubin, Inc. v. Schwartz*, 191 A.D.2d 171, 594 N.Y.S.2d 193 (1st Dept. 1993.), *citing* Restatement (Second) of Contracts, § 347 ("gains which were or could have been received by the nondefaulting party by entering into another contract or transaction should be used in reducing damages caused by a breach of contract promise only where the breach gave rise to the opportunity to enter into those other contracts or transactions").

This fundamental rule is sometimes called the "theory of offsetting benefits." *See, e.g., Macon-Bibb et al. v. Tuttle/White Constructors, Inc.*, 530 F.Supp 1048, 1055 (M.D.Ga. 1981). Under this rule, "where the defendant's tortious conduct or breach of contract causes damages, but also operates directly to confer some benefit upon the plaintiff, the plaintiff's claim for damages may be diminished by the amount of the benefit received." *Id.* However, the rule of offsetting benefits can only be utilized "when the benefits accruing to the plaintiff are sufficiently proximate to the contract to warrant reducing the plaintiff's damages." *Id.; see also, Resolution Trust Corporation v. Fleischer*, 880 F.Supp. 1446, 1451 (D.Kan. 1995)(noting viability of rule only where the defendant's conduct resulted in "a direct and immediate savings to the plaintiff"); *Keywell Corporation v. Piper & Marbury, LLP*, 1997 WL 627636, *5 (W.D.N.Y.)(offsetting benefit rule only applies to profits attributable to the same transaction that is subject of breach of contract claim).    The rule thus generally involves two basic and limited situations:  where the means necessary for the plaintiff to have obtained the profit or savings from a contract entered into subsequent to the breach would not have been unavailable but for the breach; and where the breach resulted in a direct and immediate savings to the plaintiff, *i.e.*, savings on the cost of its foregone performance.  *Id.*

---

b ("[d]amages resulting from an invasion of one interest are not diminished by showing that another interest has been benefited").

The contract cases cited by Cendant in support of its argument for offset do not contradict this general rule and, indeed, contrary to Cendant's readings, actually supply examples of the rule's application. *See* Cendant Mem., pp. 27-29. Cendant first cites *Alesayi Beverage Corp. v. Canada Dry Corp.,* 947 F.Supp. 658 (S.D.N.Y. 1996). *Alesayi* involved damages caused to Canada Dry when a Saudi bottler breached its licensing agreement to bottle and sell orange soda in the Middle East. In an utterly commonplace decision, the court held that Canada Dry had to offset the variable costs it saved from not having to manufacture the soda extract and the advertising costs it would have incurred under the *same* agreement. Similarly, the second case cited by Cendant, *Indu Craft, Inc. v. Bank of Baroda,* 47 F.3d 490 (2d Cir. 1995), involved damages to a company arising out of a bank's breach of a revolving credit agreement; the court held that the damages had to be offset by the debt remaining on the *same* note. Here, where the profits Cendant seeks to offset against the Reliant Plaintiffs' damages do not arise from the same agreement, but instead arise from separate transactions entered into at different times and – in the case of their short sales – with third parties, such offsets are inappropriate because profits from separate transactions are not "direct and immediate savings" to the Reliant Plaintiffs resulting from the breach.

Cendant's third contract case, *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1371 (Fed.Cir. 2003), is similar. *Talman* is a mitigation of damages case. Talman had sued the Government based on the Office of Thrift Supervision's breach of an agreed plan for the sale of assets by the bank, which caused it to be unable to raise additional capital and unable to achieve capital compliance under the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"). The court held that Talman had to offset the damages it suffered arising from the Government's breach against profits it obtained after the breach when it was acquired by a

- 26 -

third party, ABN AMRO, and recapitalized to achieve FIRREA complaince.  However, the

court specifically rejected other claims for offset requested by the Government arising out of

profits from "other transactions after Talman became an ABN AMRO subsidiary" as

"commercial activity remote from the actions taken to achieve compliance with FIRREA,"

because "subsequent investments... and ensuing profitability... are not properly viewed as

actions in mitigation of the FIRREA-induced breach."  *Id.* at 1374.  The court explained that

"precedent takes cognizance of the remoteness, as contrasted with the proximity, of ensuing

events," and hence damages should be reduced only "when there is a direct relation, in time and

subject matter, between the breach and the mitigating events."  *Id.* at 1371, *citing* Restatement

(Second) of Contracts, § 347(c).

    *Talman* also importantly notes that even reduction for mitigation is inappropriate where

"there is a tortious... component to the breach, or when the equitable balance is such that any

windfall should not benefit the wrongdoer."  *Id.* at 1372.  Here, where the breach of contract

alleged is a breach of the duty of good faith and fair dealing, and where the Court, by granting

Cendant the offsets it requests, would be sanctioning the retirement of some $95 million of its

debt at no cost to the company (in exchange for treasury stock), there is obviously both a tortious

component to the breach and a windfall to the wrongdoer.

    In short, all three of the breach of contract cases cited by Cendant stand for the

proposition that, while offsets against damages might be appropriate where the damages and the

benefits to the plaintiff arise from the same transaction, offsets are not appropriate where the

requested offset involves different transactions, or where there is a tortious component to the

breach, or where the offset would amount to a windfall for the defendant, circumstances that are

all at play in this case.

Finally, Cendant's reliance on *Minpeco v. Conticommodity Services, Inc.*, 676 F.Supp. 486 (S.D.N.Y. 1987) is misplaced. *See* Cendant Mem., pp. 29-31. *Minpeco* is not a contract case at all, but rather a case involving claims under the Commodities Exchange Act, federal antitrust law, and RICO, as well as claims for common law fraud. *See Minpeco v. Conticommodity Services, Inc.*, 718 F.Supp. 168, 170 (S.D.N.Y. 1989). In sanctioning offsets against damages suffered from losses on silver futures against profits on the plaintiff's physical silver holdings, *Minpeco* relies on cases decided under federal securities fraud laws, not contract law principles. 676 F.Supp. at 488, *citing Abrahamson v. Fleschner*, 568 F.2d 862 (2d Cir. 1977) and *Byrnes v. Faulkner, Dawkins & Sullivan*, 550 F.2d 1303 (2d Cir. 1977). In short, the discussion in *Minpeco* is best understood as involving exclusively securities fraud damages, measured typically by an "out-of-pocket" standard, *see Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972), and not contract damages, measured, as shown above, by a "benefit of the bargain" standard.[15]

In any event, *Minpeco*, like *Talman*, also holds that offsets may be inappropriate where, as here, "defendants will be either unjustly enriched or sheltered from any 'appreciable

---

[15] Cases in this Circuit have suggested, however, that even the "out-of-pocket" measure of damages for securities fraud is not always appropriate and that a defrauded plaintiff can take the "benefit of whichever measure of damages provides the greater recovery," out-of-pocket damages or the disgorgement of the defendant's ill-gotten gains. *See Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402, 416-17 (3d Cir. 1973). Indeed, many cases other than *Rochez Bros.* have concluded that it is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them. *See, e.g., Pidcock v. Sunnyland America, Inc.,* 854 F.2d 443 (11th Cir.1988); *Siebel v. Scott,* 725 F.2d 995, 1001 (5th Cir.), *cert. denied,* 467 U.S. 1242, 104 S.Ct. 3515, 82 L.Ed.2d 823 (1984); *SEC v. MacDonald,* 699 F.2d 47, 53 (1st Cir.1983); *Levine v. Seilon, Inc.,* 439 F.2d 328, 334 (2d Cir.1971); *Baumel v. Rosen,* 412 F.2d 571, 575 (4th Cir.1969), *cert. denied,* 396 U.S. 1037, 90 S.Ct. 688, 24 L.Ed.2d 681 (1970); *cf. Green v. Occidental Petroleum Corp.,* 541 F.2d 1335, 1342 (9th Cir.1976) (Sneed, Circuit Judge, concurring in part and concurring in the result in part); *see also, Texas Co. v. Miller,* 165 F.2d 111, 114-15 (5th Cir.1947) ("Equity does not look with favor on the unjust enrichment of one person at the expense of another"), *cert. denied,* 333 U.S. 880, 68 S.Ct. 911, 90 L.Ed. 1155 (1948).

- 28 -

liability.'" *Id*. at 490. In so doing, *Minpeco* follows the general rule announced in *Randall v. Loftsgaarden*, 478 U.S. 647, 106 S.Ct. 3143, 3153 (1986), to the effect that the "actual damages" provision in the federal securities laws does not impose a "rigid requirement that every recovery... must be limited to the net harm suffered by the plaintiff." *Id*. at 489-490 ("*Loftsgaarden* may be fairly read as supporting the proposition that a there is no rigid requirement that a plaintiff must always be limited to its net economic injury where such a limitation would be inequitable or contrary to deterrent goals.").

None of Cendant's cases and nothing in its argument changes the fact that basic principles of contract law do not permit the kind of global offsetting of profits on separate transactions against Cendant urges.[16] Such offsetting would deny the Reliant Plaintiffs their benefit of the particular bargain they struck when they purchased Cendant's convertible bonds and would instead give Cendant a windfall. That result would be incorrect as a matter of law and obviously unfair to innocent parties like the Reliant Plaintiffs. The Court should reject Cendant's argument for offsetting.

### 3.    Damages and Prejudgment Interest

The Reliant Plaintiffs' principal brief presented a simple model for calculating its rescissionary damages. The Reliant Plaintiffs seek rescission of their conversion of the Bonds into Cendant stock, *i.e.,* the return of the Bonds and all accrued interest, or the cash equivalent as damages. It is undisputed that, on April 3, 1998, the Reliant Plaintiffs held a total of

---

[16] For the same reason, Cendant's reliance on an oral ruling by this Court in dealing with aspects of the class action settlement reached by Cendant in this case is misplaced. *See* Cendant Mem., pp. 3-4. There, of course, the Court was dealing with a securities fraud class action, not with a breach of contract claim. Moreover, the offsetting involved was embodied in the settlement agreement and plan of allocation entered into between Cendant and the Lead Plaintiffs and effectively agreed to by all class members who did not opt out. But the Reliant Plaintiffs did opt out, and brought the present action, which includes the claim for breach of contract that is the subject of the present motion.

- 29 -

$18,881,000 par value of the Bonds, and that, on April 6, 1998, the Reliant Plaintiffs converted

their Bonds into 680,244 shares of Cendant common stock.   Had Cendant permitted the Reliant

Plaintiffs to rescind its conversion in the aftermath of their announcement of the accounting

fraud, the Reliant Plaintiffs would have returned those 680,244 shares and received Bonds whose

value as of May 4, 1998 was $1,033.93 per $1,000 par value, for a total of $19,521,632.33, a

figure, again, that Cendant does not dispute.   For the purposes of this Motion, the Reliant

Plaintiffs thus seek in judgment against Cendant the difference between two figures, the

redemption value of the Bonds and the "true value" of the stock.

The only question on damages would thus be the appropriate "true value" of Cendant

stock the Court should use.  Dr. Mayer concedes that the true value of Cendant stock as of May

4, 1998 was, at most, $19.00.  *See* Mayer Decl., ¶ 105.  Thus, at most, the "true value" of the

680,244 shares the Reliant Plaintiffs would have returned upon rescinding their conversion of the

Bonds would have been, Cendant concedes, $12,924,636 (or $19 times 680,244).   If the Court

rejects, as it should, Cendant's offsetting model, the Reliant Plaintiffs' rescissory damages would

thus be, at the very least $6,596,996.[17]

However, the Reliant Plaintiffs' posit that the price of Cendant stock the day after

Cendant's last significant disclosure, the August 28, 1998 release of the Audit Committee

Report, represents the best estimate of the stock's true value – that price was $11.625.  Based on

Dr. Mayer's own data, this price makes sense.  Cendant's stock price dropped more than 10% on

only four days between April 15, 1998 and September 1, 1998:  (1) the day after the initial

disclosure of accounting irregularities, April 16, 1998, when it dropped 46.5%; (2) the day

---

[17] Dr. Mayer's model, meanwhile, yields, as shown above, a figure for damages arising out of the
conversion of the Bonds of $4,642,068. Again, this figure provides a floor for the amount of
damages the Court must award *now* via summary judgment, should the Reliant Plaintiffs prevail
on liability and the Court rejects Cendant's offsetting theory.

- 30 -

rumors began circulating about the Audit Committee Report, July 13, 1998, when it dropped 14.2%; (3) the next day, when Cendant announced that the irregularities were more substantial than previously disclosed, July 14, 1998, when it dropped 16.9%; and August 31, 1998, the first trading day after the release of the Audit Committee Report, when it dropped 11.8%. *See* Mayer Decl., Exhibit 6a, 6b, 6d. Estimating damages based on the value of Cendant stock after that final disclosure is reasonable. *See, e.g., Architector Co. v. Slomon*, 192 Misc. 319, 80 N.Y.S.2d 590, 595 (1948)(damages for breach of contract may be based on "reasonable conjectures and probably estimates" yielding "the best approximation possible through the exercise of good sense and judgment"). Using this figure for the "true value" of Cendant's stock, as the Reliant Plaintiffs showed in their principal brief, yields rescissory damages of $11,613,795.83.

To this figure the Court must add prejudgment interest running from the date of the breach, which for purposes of this Motion should be considered to be the date Cendant refused the Reliant Plaintiffs' request to rescind the conversion of their Bonds, May 1, 1998. Contrary to Cendant's argument, *see* Cendant Mem., pp. 31-32, the minimum mandatory interest rate that must be used under New York law is 9%. *See* N.Y.C.P.L.R. § 5004. New York cases show that contract rates such as the interest rate found in a note or bond may only be used to calculate prejudgment interest if the rate is *higher* than the default statutory rate. *See, e.g., L&B 57th Street, Inc. v. E.M. Blanchard, Inc.*, 1997 WL 30945, *2 (S.D.N.Y.)("[p]rejudgment interest is available in breach of contract actions and parties are free to contract for a rate higher than the statutory rate"). Requiring prejudgment interest to be calculated at a rate no lower than the default statutory minimum rate serves the purpose of awarding interest, which is to fully compensate plaintiffs for the time value of their money and to foster prompt payment. *See Mosesson v. 288/98 W. End Tenants Corp.*, 294 A.D.2d 283, 743 N.Y.S.2d 269 (2002). As

- 31 -

shown in the Reliant Plaintiffs' principal brief, through May 1, 2005, accumulated interest on the judgment the Reliant Plaintiffs seek would thus be $7,316,691.37, representing seven years of interest at $1,045,241,62 per year. The total judgment the Reliant Plaintiffs seek is thus $18,930,487.20.

**CONCLUSION**

The Reliant Plaintiffs' motion for summary judgment on their contract claim is grounded in fundamental principles of contract law and simple logic. The Reliant Plaintiffs simply ask for the benefit of their bargain. That bargain entitled Cendant to notice the redemption of the Bonds only if a condition precedent was met – a trigger-price. That trigger-price was not met legitimately, but only met through Cendant's own fraud. The Reliant Plaintiffs were thus entitled to rescind their conversion of the Bonds in April 1998 when Cendant announced the accounting fraud, and are entitled to rescissionary damages now.

Cendant's arguments why this simple and fair result should not be reached hinge on a desperate and belated invocation of the Indenture's no action clause; a renewed attempt to disown its own most senior officers' conduct through the adverse agent exception to imputation of agents' knowledge to their principal; and a Rube Goldberg-like offsetting model for reducing the undisputed damages the Reliant Plaintiffs suffered on the Bonds by supposed profits they achieved on separate transactions. None of these arguments has any basis in the law and, indeed, they all contradict settled principles of the contract and agency law.

For too long, Cendant has avoided full responsibility for its conduct through gambits like those it attempts here. This Court should easily see through Cendant's gambits and award summary judgment to the Reliant Plaintiffs.

- 32 -

Dated this 1st day of July, 2005.

By:   Peter S. Pearlman /s    

Peter S. Pearlman
COHN LIFLAND PEARLMAN
  HERRMANN AND KNOPF, LLP
Park 80 Plaza West One
Saddle Brook, NJ 07663
(201) 845-9600

Michael H. Schaalman
Paul D. Bauer
QUARLES & BRADY LLP
411 East Wisconsin Avenue
Milwaukee, Wisconsin 53201
Tel. No.: (414) 277-5000

*Attorneys for Plaintiffs*
*Reliant Trading and*
*Shepherd Trading Limited*

QBMKE\5757392.2